[No. 57272-1. En Banc. February 11, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY MICHAEL BENN, *Appellant*.

632

634

636

638

*Gary Benn,* pro se, *Gregg Eric Johnsen,* and *Constance O'Brien Bartholomew,* for appellant.

*John W. Ladenburg, Prosecuting Attorney,* and *Kyron Huigens, Deputy,* for respondent.

GUY, J. — Gary Michael Benn was convicted by a jury in Pierce County Superior Court on two counts of aggravated first degree murder. During the sentencing phase of Benn's case, the jury determined there were not sufficient mitigating circumstances to warrant leniency, and Benn was sentenced to death. Benn appealed directly to this court pur-

suant to the mandatory review provisions of Washington's capital sentencing statute, RCW 10.95.100. Finding no reversible error, we affirm both the jury's conviction of Benn and its sentencing verdict.

## FACTS

On February 10, 1988, Gary Michael Benn made a 911 call to the Pierce County Sheriff's Department and reported finding two bodies at a residential address he gave in Puyallup, Washington. Officer Junge of the Pierce County Sheriff's Department responded, arriving at the scene at 4:35 p.m. There was no one outside the residence, and Officer Junge requested through his radio that the 911 caller come outside the house. Gary Benn came outside and met Officer Junge.

Inside the residence, Officer Junge found the bodies of two adult males: Jack Dethlefsen (Benn's half-brother) and Michael Nelson (a friend of Jack Dethlefsen's). Officer Junge checked for vital signs and found none. He then checked for wounds on the bodies. He found a blood patch on the back of Jack Dethlefsen's shirt and a bullet wound in Mike Nelson's jacket. Officer Junge also noticed head wounds on each victim. Officer Junge also noticed a .45-caliber handgun lying on the floor between the elbow and knee of Mike Nelson. The gun was in a half-cocked position. No one else was found in the house. Officer Junge took 15 photographs of the crime scene, including photos depicting the position of the bodies with their wounds. He noted a baseball bat and a gun cabinet near where Jack Dethlefsen lay. Officer Junge checked the vehicles located in front of the house and found that Benn's Cadillac had no engine heat and little, if any, radiator warmth.

Deputy Jones of the Pierce County Sheriff's office arrived shortly after Officer Junge and observed shell casings around both victims. He also noticed that the gun cabinet nearest to victim Dethlefsen had been broken and that glass from the cabinet was lying next to Dethlefsen's right elbow.

Deputy Jones compared a tread pattern of a shoe or boot from the glass shard to the sole of Benn's boot and concluded they were the same pattern. Deputy Hilding Johnson of the Pierce County Sheriff's office also made a similar comparison of the footprint and Benn's boots.

Dr. John Howard, a Pierce County pathologist, performed autopsies on both the bodies of Dethlefsen and Nelson. He found similar wounds to both bodies. Each had a gunshot wound entering the chest and exiting the back, and each had a gunshot wound to the back of the head or neck entering from the rear and exiting from the front. Dr. Howard determined that either shot to each victim would have been fatal. It was his opinion that the shot to the chest would have occurred first in each case, and that after such a shot to the chest it would be possible for the victims to have walked, crawled or moved for several seconds.

Police investigation disclosed that earlier on the afternoon of February 10, 1988, three boys met to play football in the street in front of the crime scene. These boys saw a man they later identified as Gary Benn enter the house at about 3:15 p.m. They saw no one leave the house between 3 and 4:10 p.m.

Other trial testimony established that Gary Benn had been at a barber shop owned by his friend, Larry Kilen, from about 1:30 in the afternoon until just before 3 p.m. Benn made several telephone calls during this time. One telephone call provoked Benn's concern regarding events at Jack Dethlefsen's house, and Benn left soon after. Larry Kilen believed Benn was intending to travel directly to Dethlefsen's house.

On May 9, 1988, after several weeks of investigation into the killings, Gary Benn was arraigned on two counts of aggravated first degree murder. After his arraignment, Benn told several persons that he had shot and killed Dethlefsen and Nelson. Roy Patrick, a jailhouse informant who had previously worked as an informant regarding narcotics investigations with Tacoma police, testified that Benn asked him if

he knew anyone who liked life in jail better than life in the outside world. Although Patrick had no intention of helping Benn find a person willing to take responsibility for the murders, he told Benn he did know such a person. According to Patrick, Benn then offered to bail Patrick out of jail if Patrick would find a person who would agree to volunteer to confess to Benn's crimes. As part of this plan, Benn gave Patrick details of the murder incident that only the murderer would know. Benn drew diagrams for Patrick showing the positions of Dethlefsen and Nelson at the moment they were shot. One of the diagrams Benn had given Patrick had Benn's fingerprints on it. After receiving the diagrams, Patrick contacted authorities with the information Benn had given him and offered to make a deal to testify for the State.

Patrick testified that Benn said he had been arguing with Dethlefsen and Nelson when Dethlefsen leaned for a gun on a nearby table. Benn said he reached the weapon first and shot Nelson and then Dethlefsen. Benn explained that he shot both men in the back of the head to assure they were dead. Patrick testified that Benn admitted that he, Dethlefsen, and Nelson had created phony insurance claims, with Dethlefsen and Nelson faking a burglary of Benn's mobile home and burning it to create the loss. Benn did not give a share of the insurance proceeds to Dethlefsen or Nelson, spending the insurance money on a Cadillac and a mobile home park. Benn indicated to Patrick that Dethlefsen and Nelson were about to go to the police to expose Benn in their frustration.

Benn's brother, Monte Benn, also testified that Benn had confessed to the killings. Monte stated that Benn told him Dethlefsen made harassing and threatening phone calls to Benn's ex-girlfriend, and Benn and Dethlefsen were arguing about the calls just before Benn killed Dethlefsen and Nelson. Benn initially told Monte that on the afternoon of the murders he had left Larry's Barber Shop, waited for a prospective tenant at his trailer park, and then proceeded to Dethlefsen's house. He later changed the story, saying he

had gone to South Tacoma Way to pick up a prostitute before going to Dethlefsen's. He claimed, variously, that he picked her up for himself, that he picked her up for Dethlefsen, and that he returned her to South Tacoma Way because Dethlefsen was too drunk. Benn also told Monte that as he entered Dethlefsen's house, someone put a gun to his head and threatened to kill his children if he ever mentioned the murders. Later Benn claimed someone he never saw put a gun to his head and made him kill Dethlefsen and Nelson. Monte testified that Benn told "quite a few" different versions of his activities on the day of the murders. Finally, however, on May 20, 1989, during a visit by Monte to Benn while Benn was in custody, Benn admitted killing Dethlefson and Nelson.

Denver Carter, a friend and former business associate of Benn's, testified that Benn confessed to the killings of Dethlefsen and Nelson some 6 or 7 months after the murders. Denver Carter met Benn in February 1988, the month of the murders, when Benn began work at the same sales office as Carter. Carter moved into Benn's home in May 1988 and lived with Benn until October 1988. Carter testified that during a camping trip in August or September 1988, after Carter had brought up the subject of the killings many times, Benn admitted to the murders: "Just said he went over to the house and he just did it." Report of Proceedings, at 1905.

There was a substantial amount of circumstantial evidence linking Benn to the two murders. Benn's left boot was spattered with 13 or 14 drops of blood. The samples were too small for species analysis. According to police experts, however, the pattern of spatter itself was sufficiently singular to prove the blood came from Mike Nelson's head wound. A footprint found on a piece of broken glass from the gun cabinet indicated that when Nelson was shot in the head, the murderer was standing directly over Nelson with his foot near Nelson's head. The experts testified that the muzzle of the gun was in such proximity to the back of Nelson's

head that gases penetrated the scalp and built up between the skull and scalp "causing a ballooning effect". Blood between the scalp and skull then spattered out in tiny droplets in a phenomenon unique to such contact wounds known as "blowback". The blood on Gary Benn's boot was identified by Pierce County investigators as high speed blood spatter that is a "blowback" from a contact wound.

A newspaper found on the couch where Benn told Patrick Dethlefsen was sitting had a bullet hole in it and was soaked with blood. The blood was of Dethlefsen's type. Benn had told Patrick that he had had a fight with Dethlefsen the night before the murder, which left blood all over the kitchen. There was blood found in the kitchen which was of Dethlefsen's type.

While officers conducting the initial investigation of the scene had observed that the boot print on the glass near Nelson's head matched the boots worn by Benn at the time, Benn denied to them that he had been near the bodies. Benn had claimed that he discovered the bodies and called 911 immediately on arriving at Dethlefsen's house. By Benn's account, the officers arrived 15 minutes later. Benn's car engine, engine oil, and radiator, however, were cold at the time the investigating officers arrived. Benn claimed that he had left Larry's Barber Shop between 2:30 and 3 p.m., had spent an hour to an hour and a quarter at his house, and then drove to Dethlefsen's. The boys playing in front of the crime scene testified that Benn arrived between 3 and 3:15 p.m.

Other circumstantial evidence of Benn's guilt included the following: the owner of Larry's Barber Shop testified that Benn had an angry telephone conversation with Dethlefsen just before Benn left the barber shop a few minutes before 3 p.m. An investigator for the county medical examiner who examined the bodies at the scene shortly after 5 p.m. placed the time of death as approximately 3 p.m. The day following the killings, Benn attempted to persuade a neighbor to provide him with an alibi for the time of the murders.

There was also evidence presented of a previous attempt by Benn to hire someone to kill Jack Dethlefsen for him. Benn told Patrick that he had hired "Pete", a former tenant of Benn's trailer park, to kill Dethlefsen. Walter Peter Hartman was located during Benn's trial. Hartman testified that in January 1988, Benn had asked him to shoot someone named Jack. Hartman testified that Benn drove him to Dethlefsen's home, described how Hartman was to shoot Dethlefsen when he answered the door, and showed Hartman a gun he was to use in the killing. Hartman testified Benn told him that Benn wanted Dethlefsen to die because Dethlefsen had molested, raped or assaulted members of Benn's family. (Roy Patrick testified that Benn also wanted "Pete" killed by the person whom Benn had asked Patrick to find to take responsibility for Benn's crimes.)

Denver Carter gave testimony that Benn told Carter a "Pete" owed Benn a favor and that he had a job for him. Carter testified that Benn also told him that when he called Dethlefsen's house the day of the killings, "nobody was supposed to answer the phone".

At arraignment on aggravated first degree murder charges on May 9, 1988, the prosecutor informed defense counsel that the State was contemplating filing a death penalty notice under RCW 10.95.040(1) and that information in mitigation should be presented to the prosecutor's office by May 23, 1988. The information counsel presented in mitigation related to Benn's character and the impact his execution would have on his family. The elected prosecutor, John Ladenburg, made the final decision to seek the death penalty. The death penalty notice was signed by a deputy prosecuting attorney and filed on June 7, 1988.

After notice was filed, Benn obtained new counsel. Benn's initial counsel were permitted to withdraw for cause. His new trial counsel presented additional mitigating evidence to the prosecuting attorney. As before, the mitigation was limited to evidence regarding the defendant's character and family. In June 1989, the prosecuting attorney offered to request the court to withdraw the death penalty notice in

exchange for a plea of guilty to two counts of aggravated first degree murder. Aside from that possible bargain, however, the prosecutor declined to request withdrawal of the notice, being unpersuaded that there were sufficient mitigating factors to merit leniency.

While Roy Patrick, the jail inmate to whom Benn had confessed, was waiting to testify against Benn, another police informant reported that Patrick was dealing drugs from Patrick's room at a Tacoma motel. A search warrant was issued and executed. Nothing involving criminal activity was found in Patrick's motel room.

In preparation for trial, the defense made a general request under CrR 4.7(a)(3) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), for all exculpatory evidence. The fact that a search warrant had been issued and executed on Patrick's motel room based on an informant's tip alleging that Patrick was dealing narcotics was not disclosed to the defense team. When the defense did learn of the warrant from other sources, they made a request for the information and it was provided to them. Defense counsel then sought to interview the informant against Patrick. The trial judge held an in camera interview with the informant and informed the defense of the information learned in that interview. The trial judge denied defense motions for a continuance, a mistrial, to strike Patrick's testimony, or to recall Patrick for further cross examination on the drug dealing allegations. The court held that the allegations were not relevant to Patrick's truthfulness or untruthfulness under ER 608(b) because they occurred long after his jail conversations with the defendant and had no bearing on his ability to recount those conversations in court.

At trial, immediately before the State was to present the testimony of Walter "Pete" Hartman, Benn's attorneys moved to continue the trial in order to obtain a psychological evaluation of Benn. They submitted that Benn was incompetent to proceed because Benn had directed the defense not to call family members in the guilt or penalty

phase, based on an unsubstantiated belief that family members' lives had been threatened. The court requested evaluations of the defendant from three psychologists: Dr. Carl Reddick, Dr. Lloyd Cripe, and Dr. Brett Trowbridge.

Dr. Reddick found no indication of a mental disease or defect and thus no evidence of incompetence to stand trial under RCW 10.77.050. Dr. Reddick was of the opinion that Benn was malingering and that Benn had been untruthful, vague, hesitant, and evasive during his evaluation. Dr. Reddick stated that such behavior is not typical of the mentally ill, but is typical of those attempting to avoid responsibility. While Benn claimed to be hearing voices, Dr. Reddick opined that Benn was inconsistent and hesitant when Dr. Reddick attempted to elicit specifics and gave answers which were not consistent with clinical observations of those who suffered from a delusion. While Benn was understandably depressed, Dr. Reddick indicated that condition would not have an effect on his competence to stand trial.

Dr. Cripe was of the opinion that Benn was not competent to proceed. Dr. Cripe found that Benn suffered from a delusion that "Pete" would harm his family if Benn testified and that delusion would interfere with his assisting counsel. However, on cross examination, Dr. Cripe indicated he did not know the legal definition of competency to stand trial. Dr. Cripe also knew few facts of the case.

Dr. Trowbridge was of the opinion that Benn was competent to proceed with the remainder of the guilt phase but was not competent to proceed to the penalty phase. He agreed with Dr. Cripe that Benn's belief that "Pete" would kill his family if he or they testified was a genuine delusion, but he disagreed with Dr. Cripe's conclusion that it was an isolated delusion which would not render Benn incompetent to stand trial. Dr. Trowbridge's opinion was that Benn might be incompetent for the penalty phase because his delusion might prevent him from making an allocution at the penalty phase, which would very likely affect the outcome of the penalty phase. Conversely, regarding the guilt phase, Dr. Trowbridge felt that a delusion-prompted deci-

sion not to testify in his defense in the guilt phase would not affect the outcome in that phase. He therefore felt that Benn's delusions did not overwhelm his competence to proceed with the guilt phase.

The court determined that Benn was malingering, as suggested by Dr. Reddick, and that he was competent. The court therefore denied the motion to continue the trial. (The defense presented the court with another motion to the same effect at the beginning of the penalty phase. Without taking further testimony from the experts, the court denied that motion.)

The jury returned a verdict of guilty on both count 1 and count 2, finding that Benn had committed first degree murder accompanied by an aggravating circumstance: multiple victims killed as part of a common scheme or plan.

At the outset of the penalty phase, Benn moved to represent himself. This motion was prompted by his conflict with counsel — Benn insisted that no case be presented in mitigation and defense counsel intended to present mitigation in spite of Benn's wishes. The motion was granted, and defense counsel Raymond Thoenig was appointed to act as standby counsel. When Benn subsequently decided he was incapable of proceeding without counsel, Mr. Thoenig told the court he was prepared to produce his witnesses and did proceed after a 20-minute continuance.

The mitigation presented was evidence of the defendant's good character and the impact his execution might have on his family. This was the same information and argument that was presented by Benn's attorneys prior to the filing of notice under RCW 10.95.040(1). Benn was provided an allocution opportunity and spoke to the jury.

At the end of the penalty phase, the jury found there were not sufficient mitigating circumstances to merit leniency. Pursuant to RCW 10.95.030(2), Benn was sentenced to death.

The trial court, pursuant to RCW 10.95.120, filed with this court on July 23, 1990, its report on the defendant's conviction for aggravated first degree murder for use in this

court's statutorily mandated comparative proportionality review of Benn's sentence.

## STANDARD OF REVIEW

██ ██ Benn challenges both his conviction and his sentence based on a number of claimed constitutional and procedural errors. We review assignments of guilt phase error in capital cases no differently than in noncapital cases. *State v. Lord*, 117 Wn.2d 829, 849, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992). However, claims of error associated with the *sentencing* phase of a capital case are given heightened scrutiny. *Lord*, at 888. Since the death penalty is qualitatively different from all other punishments, it is all the more important that there be reliability in any determination that death is appropriate punishment in a given case. *Lord*, at 888. However, while heightened scrutiny means a closer, more careful review of the record, it does not entail a raised standard of review. *Lord*, at 888. While this court may look more closely at the record in a capital case to determine whether the trial court met an applicable standard of review, *e.g.*, abuse of discretion, we do not subject the trial court's actions to a higher standard of review because the context is a capital case.

Each issue raised by Benn is separately discussed in the following analysis section.

## ANALYSIS
## GUILT PHASE ISSUES
### Admission of Testimony of Roy Patrick

Benn contends the trial court erred in allowing the State to present the testimony of witness Roy Patrick. Benn submits that his conviction should be reversed because the State failed to produce material information to the defense in response to a general request under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Benn argues that information about the search warrant and the affidavit of a confidential informant regarding Roy Patrick's alleged drug activity from his motel room was improperly withheld by the prosecution. Benn argues due process was

violated by this omission and that reversal of his conviction is the required remedy.

The State submits this case should be reviewed under *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), which, the State argues, provides the applicable standard of "materiality" in this context. Also offered by the State is *State v. Laureano*, 101 Wn.2d 745, 682 P.2d 889 (1984), in which this court summarized three possible suppression situations and addressed the *Agurs* standards to be applied to them:

> In *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the Supreme Court applied the *Brady* rule to three distinct suppression situations. First, where prosecutorial misconduct is involved, a conviction "must be set aside if there is any 'reasonable likelihood' " that the undisclosed testimony could have affected the jury's decision. *Agurs*, 427 U.S. at 103. Second, if the defense has made a pretrial request for specific evidence, the test focuses on whether "the suppressed evidence might have affected the outcome". *Agurs*, 427 U.S. at 104. Third, where a general *Brady* request has been made or no request has been made at all, the duty to disclose evidence arises only if the "evidence creates a reasonable doubt that did not otherwise exist". *Agurs*, 427 U.S. at 112.

*State v. Laureano*, 101 Wn.2d at 759.

Neither party in this appeal has addressed the case of *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), which revised the *Agurs* rule for determining the materiality of information in nondisclosure situations. In *Bagley*, the Supreme Court held that evidence withheld by the government is "material" (such that its nondisclosure would require reversal of a defendant's conviction) only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, at 682. A "reasonable probability", the Court explained, "is a probability sufficient to undermine confidence in the outcome." *Bagley*, at 682.

The Court in *Bagley* held that this formulation was "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused". *Bagley*, at 682.

We accordingly apply *Bagley* to this case: "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, at 676 (citing *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972)). The *Bagley* opinion provides the following additional guidance:

> The constitutional error . . . in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. As discussed above, such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," *United States* v. *Agurs*, 427 U. S., at 112, a constitutional error occurs, and the conviction must be reversed, *only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.*

(Italics ours.) *Bagley*, at 678. In reviewing prosecutorial conduct pursuant to this standard, *Bagley* further states:

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]

(Footnotes omitted.) *Bagley*, at 675.

Applying the *Bagley* rule to Benn's case, we conclude that the State's nondisclosure of the information regarding Roy Patrick does not warrant reversal. The information Benn claims the State withheld was not *both* favorable to the accused *and* material to determining guilt or punishment. *See Bagley*, at 674. The defense already had been informed that Patrick was benefiting from his testimony against Benn by virtue of his arrangement with the police. The subsequent search of Patrick's motel room does not indicate anything further regarding Patrick's motives for testifying than was already known by the defense and revealed no criminal conduct. There exists no reasonable probability that, had this evidence been disclosed to the defense, the results of Benn's trial would have been different.

We accordingly reject this assignment of error.

Cross Examination of State's Witness Patrick

Benn contends the trial court unduly restricted the defense's ability to cross-examine state witness Roy Patrick. He assigns error to the trial court's rulings that Patrick's alleged drug-related activities were collateral and thus beyond the scope of cross examination. Benn argues he was denied his right to confront all witnesses due to being precluded from "full cross examination" of Patrick.

▪▪ We disagree. When the defense became aware of the warrant search of Patrick's room and requested information on this matter, it was provided. When the defense then asked to interview the confidential informant, the judge held an in camera interview with the informant and the investigating officer and relayed to the defense the information acquired in these interviews. Defense counsel was nevertheless able to cross-examine Patrick regarding his motive to testify and his possible bias in favor of the State. Trial courts have discretion to determine the scope of cross examination and to prohibit further questioning where the claimed bias is speculative or remote. *State v. Young*, 89 Wn.2d 613, 628, 574 P.2d 1171, *cert. denied*, 439 U.S. 870 (1978); *State v. Guizzotti*, 60 Wn. App. 289, 293, 803 P.2d 808, *review denied*, 116 Wn.2d 1026 (1991); *see also Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). Roy Patrick had already negotiated and agreed to testify against Benn in exchange for 6 months off the sentence he was serving when he encountered Benn. At the time of the alleged drug-dealing incident, the defense was allowed thorough cross examination on the subject of his deal. The allegations of Patrick's drug dealing were not relevant to his credibility as a witness under ER 608(b), as the activities alleged by the informant took place after Patrick's deal and did not impact Patrick's ability to relate his discussions with Benn on the witness stand. The trial court did not abuse its discretion limiting Benn's cross examination of Patrick on allegations of drug dealing.

Nor did the trial court err in refusing to allow the defense to call the confidential informant to the witness stand to

rebut Patrick's denial of drug dealing. The court was within its discretion in ruling such testimony would not have been relevant to Patrick's credibility regarding his jailhouse conversations with Benn. Moreover, ER 608(b) expressly prohibits an attack on witness credibility through resort to extrinsic evidence for proof of specific instances of witness conduct:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, *if probative of truthfulness or untruthfulness*, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

(Italics ours.) Since the trial court was well within its discretion in ruling the matter irrelevant, we leave undisturbed its decision on the defense's request to impeach Patrick.

Evidence of Victims' Involvement
With Benn in Insurance Fraud

Benn argues the trial court erred under ER 404(b) in allowing the State to present evidence of his prior bad acts. ER 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, *such as proof of motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(Italics ours.) Benn contends the State should have been barred from introducing evidence of his involvement in insurance fraud with the murder victims through the planned burglary and arson of his trailer residence. The defendant asserts first there was insufficient proof of these allegations; and second, that it was unduly prejudicial and irrelevant.

■■ The State offered evidence of Benn's involvement in the arson of his trailer and of fraudulent insurance claims in

order to show that Benn arranged with Dethlefsen to share the proceeds of fraud. A quarrel between the two over proceeds was argued by the State to be a motive for the murders, and proof of motive is a proper basis for the admission of prior bad acts evidence under ER 404(b). A prior bad act offered under ER 404(b) must be proved to the court by a preponderance of the evidence. *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981). The trial court's preliminary finding will be upheld if it is supported by substantial evidence. *Tharp*, at 594. We hold substantial evidence supported the trial court's finding that Benn had been involved in an insurance fraud scheme with the murder victims.

The State offered as evidence of motive Benn's involvement in insurance fraud with the victims through the testimony of Patrick:

Q: Okay. Did he indicate to you why he had killed Jack Dethlefsen and Mike Nelson?

A: Apparently he had had his brother, Jack, and Mike do a couple of things for him. One of them was, I guess, to burn his trailer to collect some insurance money which they were supposed to get half or a portion of the money. Well, he didn't pay them. Instead of paying them the money, he invested it in a trailer park. As he put it to me — I said, "That's right, you should pay your partners." He says, "Well it is for their own good." He said, "I invested the money in a trailer park and it is not making any money right now but when it does it is an investment for them." And then apparently he had them do a burglary for him which, again, he didn't pay them, he turned around [and] bought a . . . Cadillac.

Report of Proceedings, at 1233.

The State also presented evidence that Benn admitted using insurance proceeds to buy a trailer park and making an excessive insurance claim. Additionally, Monte Benn testified that Benn removed or duplicated valuables such as photos and fishing equipment from the trailer prior to the fire, and some of the items Benn claimed as lost turned up after the fire. There was substantial evidence for the trial court to have determined that prior bad acts could be admitted under ER 404(b), as this related to Benn's motive.

654

Furthermore, the probative/prejudicial ruling of the trial court under ER 403[1] will be reversed only if there has been a manifest abuse of discretion. *State v. Coe*, 101 Wn.2d 772, 782, 684 P.2d 668 (1984). There was no such abuse here. The insurance fraud scheme was clearly relevant to prove Benn's motive for the murders (to silence Dethlefsen and Nelson who were pressing Benn for money), and no unfair prejudice resulted from admission of this evidence.

Finally on this issue, we note that Benn's reliance on *State v. Hieb*, 39 Wn. App. 273, 693 P.2d 145 (1984) is misplaced. That decision was reversed by this court in *State v. Hieb*, 107 Wn.2d 97, 727 P.2d 239 (1986).

## Jury Instructions

Benn contends the jury was not properly instructed in the applicable law at the end of the guilt phase of his trial. He argues that the trial court's failure to give defendant's requested instructions 7, 8, 9, 11, 12, 19, 24, 25, 32, 33, 34, 36, 37, 42, 43, 44, 45, 46, 49 and 50 "rendered it impossible for the defense to adequately argue [the defendant's] theory of the case to the jury." Brief of Appellant, at 147. The State argues that all these rejected instructions were either unsupported by the facts, by the law, or were cumulative or misstated the law. We agree with the State's characterization of the rejected instructions.

■ Each side in a case may have instructions embodying its theory of the case if there is evidence to support that theory; it is error to give an instruction which is not supported by the evidence. *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). An instruction must state the applicable law correctly. *State v. Mark*, 94 Wn.2d 520, 526, 618 P.2d 73 (1980). Each instruction must be evaluated in

---

[1]ER 403 states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the context of the instructions as a whole. *State v. Coe*, *supra* at 788. It is not error to refuse to give a cumulative instruction or one collateral to or repetitious of instructions already given. *State v. Hawkins*, 70 Wn.2d 697, 708-09, 425 P.2d 390 (1967), *cert. denied*, 390 U.S. 912 (1968).

In light of these principles, we review Benn's challenges to the trial court's rulings regarding jury instructions in the guilt phase of his trial.

Benn argues that defense instructions 7 and 8 were necessary to instruct the jury that it was not to draw inferences from inferences nor base its verdict upon speculation. Defendant's proposed instruction 7 stated:

> In considering the evidence in this case, you are instructed that you may draw inferences from such facts as are proven. You may not draw inferences from other inferences.
> What is meant by the statement that an inference cannot be based upon another inference is that an inference cannot be based upon evidence which is uncertain or speculative or which raises merely a conjecture or possibility.

Benn's proposed instruction 8 stated:

> You may not base your verdict upon mere theory or speculation. If there is nothing more reasonable to proceed upon than two or more equally reasonable inferences from a set of facts, and under only one of the inferences would the defendant be guilty, you should adopt that which admits innocence and find the defendant not guilty.

The principle stated in these proposed instructions was adequately covered by the trial court's instruction 1, which stated in pertinent part: "Your deliberations must be based upon the evidence, and not upon speculation, guess or conjecture." The jury was adequately advised not to speculate in reaching its decision and to base it on the evidence.

Benn also challenges the refusal of the trial court to give defendant's proposed instruction 9, which stated:

> If the evidence which you have heard is susceptible of two constructions, each of which appears to be reasonable and only one of which points to the guilt of the defendant, it is your duty to adopt the interpretation which will admit that the defendant is innocent and reject that which points to his guilt.

This instruction was properly rejected as it misstated the law. *State v. Gosby*, 85 Wn.2d 758, 539 P.2d 680 (1975) (rejecting the use of the so-called "multiple hypothesis" instruction).

■■ Benn next argues that his proposed instructions 11 and 12 were necessary to assist the jury in evaluating his own "alleged statements against penal interest".[2] Instruc-

---

[2] Benn's proposed instruction 11 stated:

"The State has offered and the Court has received evidence of a statement the State claims was made by the defendant.

"Before you may consider any statement made by the defendant as evidence against him/her, you must find that the statement was made by the defendant and that it was made voluntarily. A voluntary statement is a knowing, intelligent statement, made with knowledge of the possible consequences of the statement, that is obtained without the use of abuse, force, threats, coercion, inducement of promise, or by any other means which would make such statement unworthy of belief.

"In considering whether any statement or part of it is voluntary, you should consider: One, the external circumstances — that is, the physical facts surrounding the defendant at the time the statement was made; and second, the internal circumstances — that is, the defendant's psychological response to the surrounding physical facts.

"In considering the defendant's surroundings at the time the statement was made, you should consider the conduct and the statements of others in his/her presence, the length of the questioning and his/her physical surroundings, if you find these had influence on his/her making a statement.

"In considering the defendant's psychological response to his/her surroundings, you should consider the defendant's age, education, experience, character, intelligence, previous training, mental qualities, and mental capacity at the time of making the statement. You should also consider his/her physical and mental condition and his/her susceptibility to any improper influence and to any other factor which bears upon the voluntariness of his/her statement. And, you should also consider the nature, content and import of the statement itself.

"If any statement against interest was obtained from the defendant by abuse, force, threats, coercion, inducement of promises, or while the defendant was under the influence of fear of physical punishment by those having him in custody or questioning him, it is not voluntary and you must reject any such statement or parts of statement so obtained.

"The burden of proving that any statement against interest made by the defendant is voluntary is upon the State. You should, however, consider as evidence in this case the whole or any part of any statement against interest made by the defendant which you find to be voluntary. You should consider it in connection with every other fact and circumstance laid before you, giving to it such weight and credibility you deem it entitled to."

Benn's proposed instruction 12 stated:

"A statement should not be given any consideration by you unless you unanimously find that the statement was voluntarily made and that the defendant in

tions 11 and 12 essentially handed to the jury the determination of whether alleged statements of Benn's offered into evidence were voluntary, and directed the jury not to consider at all any statements the jury found involuntary. Both of these instructions misstated applicable law. Benn's own statements were nonhearsay statements of a party under ER 801(d)(2); the references in instruction 11 to statements against penal interest are therefore erroneous. Additionally, since most of Benn's statements were made to private parties, the references to advisement of rights and voluntary waiver of rights in instruction 12 was improper. *See Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986). To the extent this instruction was intended to refer to Benn's custodial statements to police officers, it also misstates the law. The trial court determines the voluntariness of a confession as a matter of law; the jury may consider this question again only in determining what weight to give the statement. *State v. Lanning*, 5 Wn. App. 426, 487 P.2d 785 (1971). The trial court's instruction 8 adequately addressed that question:

> You may give such weight and credibility to any alleged statement by the defendant as you see fit, taking into consideration the surrounding circumstances.

Benn next argues that his proposed instructions 24 and 25 would have provided a fuller explanation of premeditation.[3] These instructions were properly rejected as cumula-

---

making it was first informed of his/her constitutional right to remain silent if he/she wished and that he/she was entitled to the benefit of advice from a lawyer at all times. A statement, even if admittedly true, cannot be used to prove guilt unless voluntarily made.

"A statement made under inducement may be considered by you. By inducement is meant promises to do a favor for the accused, such as for instance, not prosecuting some person for a crime. If you believe such promise was made in this case, you should scrutinize the statement with great care and caution so as to avoid any possible chance that one should be convicted on evidence of a statement which is not true."

[3]Proposed defense instruction 24 stated:

"Premeditation must involve more than a moment in point of time. Premeditated means thought over beforehand. It is the deliberate formation of and reflection upon the intent to take a human life and involves the mental process

tive of instruction 13, which adequately stated the rule regarding premeditation.[4]

Benn next challenges the court's failure to give his proposed instructions 32, 33, 34, 36 and 37, which dealt with self-defense and excusable homicide (accident). The instructions on excusable homicide (32 and 33) were properly rejected as there was no evidence of accident.

Benn's proposed instruction 34, dealing with self-defense, omitted the requirement that the actor's evaluation of the situation must be *reasonable*. RCW 9A.16.050(1); *State v. Hughes*, 106 Wn.2d 176, 721 P.2d 902 (1986). Benn's proposed instruction 37 was cumulative. The court's instructions 21 and 22 properly stated the applicable rule. Instruction 21 informed the jury that justifiable homicide is a defense to a charge of murder and defined justifiable homicide. It also informed the jury that the burden was upon the State to prove that the homicide in Benn's case was nonjustifiable. Instruction 22 told the jury to consider a claim of justifiable homicide in light of the circumstances reasonably appearing to the defendant at the time.[5] These instructions adequately directed the jury regarding self-defense.

---

of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short."

Benn's accompanying proposed instruction 25 stated:

"The mere passage of time for a killing to occur shows only an opportunity to deliberate and by itself is insufficient to sustain the premeditation element absent evidence that the defendant did in fact deliberate."

[4]Instruction 13 stated:

"A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person unless the killing is justifiable.

"Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed."

[5]Instruction 21 to the jury stated:

"It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.

"Homicide is justifiable when committed in the lawful defense of the slayer when the slayer reasonably believes that the person slain intends to inflict death

Benn's proposed instruction 36 was a "no duty to retreat" instruction. It stated:

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

This instruction regarding no duty to retreat was unsupported by the evidence and was properly rejected. *State v. Frazier*, 55 Wn. App. 204, 208, 777 P.2d 27 (1989) (citing *State v. Thompson*, 47 Wn. App. 1, 733 P.2d 584, *review denied*, 108 Wn.2d 1014 (1987)). There is no evidence that anyone other than Benn was the original aggressor.

The court's instruction 21 properly stated the law and did not relieve the State of its burden of proving the absence of self-defense. The jury was instructed that proof of the absence of justifiable homicide was achieved by the State proving each element of the crime charged beyond a reasonable doubt in instruction 21. The State correctly observes that "culpable intent and lawful use of force are opposite sides of the same coin." Brief of Respondent, at 61-62. *See State v. McCullum*, 98 Wn.2d 484, 495, 656 P.2d 1064 (1983).

■ Benn asserts, without analysis, that the court erred in refusing to give defense instructions 43, 44, 45, and 46, which would have allowed the jury to consider first and second degree manslaughter as additional lesser included offenses. These instructions were properly rejected. A lesser

---

or great personal injury and there is imminent danger of such harm being accomplished.

"The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the slayer taking into consideration all of the facts and circumstances known to him at the time of and prior to the incident.

"The State has the burden of proving beyond a reasonable doubt that the homicide was nonjustifiable. The State meets this burden by proving each element of the crime charged beyond a reasonable doubt."

Instruction 22 stated:

"Necessary means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended, under the circumstances as they reasonably appeared to the actor at the time."

included offense instruction need not be given if unsupported by the evidence. *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). There is no evidence the victims were killed recklessly or negligently.

Lastly, regarding guilt phase instructions, Benn argues that

[t]he wording and complexity of the instructions was such that the average juror could not understand the true nature and content of the instruction . . . This violated the due process rights of Gary [Benn] and subjected him to a verdict based solely on the passions and prejudices of the jury.

Brief of Appellant, at 151-52.

██ ██ The defendant in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied,* 113 S. Ct. 164 (1992) made a similar argument for the first time on appeal. The contention in Lord's case was based on a computer analysis using a program that scans written information to determine a reader's ease of understanding. This court noted in *Lord*:

No objection was made on this basis at trial, nor was the computer program and related analysis offered for admission at trial. Thus, not only was the issue omitted below, but also it is based on evidence not contained in the record.

*Lord*, at 880. Thus, this court declined to reach the issue of readability as it was not based upon a "manifest error affecting a constitutional right" under RAP 2.5(a)(3). This court also observed:

While we do not question that jury instructions in any death penalty case are complicated and lengthy, it is out of an abundance of caution for the defendant's rights that we are so precise. . . . Precision necessarily entails complexity. We cannot fault trial judges for failing to carefully instruct a jury, and then find error because the instructions are too complicated. The complex nature of the jury instructions is not, in and of itself, an instructional error of constitutional magnitude warranting review for the first time on appeal.

*Lord*, at 880-81.

In this case, Benn offers nothing but an unsupported assertion that the average juror could not understand the jury instructions in his case. For the reasons we stated in

*Lord,* we decline to address this contention. An appellate court need not decide a contention that is not supported by citation to authority. *Lord,* at 853.

We hold the jury instructions Benn's jury received fully and accurately informed the jury of the law and allowed Benn to argue all theories supported by the law and the evidence.

## ISSUES RELATED TO PENALTY PHASE

Claims of error associated with the sentencing phase of a capital case are given heightened scrutiny. *State v. Lord, supra* at 888.

### Competence of the Defendant

Benn argues the trial court erred in finding him to be competent to meaningfully assist counsel in the penalty phase of trial. He does not challenge the finding of competence prior to the guilt phase. Prior to the commencement of the penalty phase, the court said:

> In any event, it's my previous finding and there is nothing that has been indicated to me to change it; that the defendant is being manipulative, and I find that he is competent.

Report of Proceedings, at 2134. The court indicated that it held the defendant to a burden of establishing incompetence by a preponderance of the evidence, and further added:

> But I wanted to state for the record just in case this matter should get to the United States Supreme Court or some other Court, Federal court or otherwise, that I am convinced by a preponderance of the evidence that the defendant is being manipulative and that he is competent to proceed with proceedings.

Report of Proceedings, at 2135.

A criminal defendant may be required to prove his incompetence. *Medina v. California,* ___ U.S. ___, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992). As the trial court here noted, however, even if the State bore the burden of proving competence, Benn was shown to be competent to proceed with the penalty phase.

■ ■ A defendant is competent to stand trial if he is able to appreciate the nature of the proceedings and to assist with his defense. RCW 10.77.010(6); RCW 10.77.050. Ability to assist does not mean the defendant must be able to choose or suggest trial strategy. The trial court's determination of competence is a matter within its discretion, reversible only upon a showing of abuse of discretion. *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986).

■ Benn's alleged belief that someone named "Pete" would kill his family if he testified was considered by Dr. Trowbridge to be a delusion. Even so, Dr. Trowbridge felt Benn was competent to proceed with the guilt phase of his case because Benn's decision whether to testify in the guilt phase as a trial strategy decision was of lesser consequence than his decision whether to speak in the penalty phase. Dr. Trowbridge's opinions rested on the incorrect assumption that competence means ability to choose trial strategy. *See State v. Ortiz, supra* at 483; *State v. Harris*, 114 Wn.2d 419, 789 P.2d 60 (1990). Since Dr. Trowbridge did not analyze Benn's competence under the standards delineated by this court in *Ortiz* and *Harris*, the trial court properly rejected his conclusions. Even if all three doctors had applied the same correct legal standards, then credibility was for the trial court to determine. Dr. Reddick's evaluation, which the trial court found credible, supports the court's finding that Benn was competent, although depressed, and seeking to stall or avoid standing trial further. We accordingly uphold the trial court's determination that Benn was as competent to proceed to the penalty phase as he was to stand trial.

Ineffective Assistance of Counsel Prior to Filing

Next, Benn claims he was denied the effective assistance of counsel prior to the filing by the State of the notice to seek a special sentencing proceeding. Benn's argument suggests that he might have avoided death penalty deliberations had his counsel pretrial provided adequate representation.

██ ██ A defendant is denied effective assistance of counsel if the complained-of attorney conduct (1) falls below a minimum objective standard of reasonable attorney conduct, and (2) there is a probability that the outcome would be different *but for* the attorney's conduct. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In *Burger v. Kemp*, 483 U.S. 776, 788-89, 97 L. Ed. 2d 638, 107 S. Ct. 3114 (1987), this standard was held applicable to death penalty proceedings. *See In re Jeffries*, 110 Wn.2d 326, 332, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988); *Lord*, at 883.

Benn's claim that his attorneys failed to investigate mitigating factors to present to the prosecutor prior to the filing of the notice of special sentencing proceeding is undermined by the testimony of former counsel, Gary Clower. It is also undermined by the fact that the same mitigation factors presented by Mr. Clower prior to the filing of the special notice were also presented in the penalty phase proceedings by Benn's trial counsel.

██ In asking whether the conduct of Benn's counsel fell below the standard of reasonable conduct, the court is mindful of the following language from *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689; *accord, Burger v. Kemp*, 483 U.S. at 789.

Even if one accepts the argument that some other mitigation evidence might have been offered to the prosecution prior to the filing of the special notice, Mr. Clower's conduct need not be viewed as falling below the objective reasonable conduct standard. Contrary to Benn's assertion, Mr. Clower

made a reasoned decision to offer only character evidence and loss to family as mitigation after conferring with Benn as to mitigation evidence. Mr. Clower testified that he did discuss the question of mitigating factors with the defendant and that it was inconsistent with the defense case as presented by Benn to Mr. Clower to seek offering other mitigation evidence. Mr. Clower testified as follows:

Q: Okay. And did you ever discuss with Mr. Benn possible mitigating circumstances between the time of arraignment and the time that the notice was filed?

A: Well, I'd have to say yes, I did. I was aware very early on, before charges were even filed, that it was a potential aggravated murder case. When charges were filed, of course, it became clear at that point that the death penalty was a possibility. I am aware of the types of information that are commonly brought forth at death penalty hearings, and Mr. Benn and I had quite a few conversations. I'd have to say that I spent more time with Gary Benn than I did any other client I ever had, and I spent time with various members of his family. And I think during that period I had a pretty good understanding of his background and what I believed to be the facts of the case.

. . . .

Q: And why was that?

A: Well, I guess you have to look at the case that I had at the time, which is possibly a little bit different than most of the aggravated murder cases that the courts see. We had a case here where the evidence I had at the time was that my client was not there, did not commit the murders, was not at the scene. And there was no physical evidence early on. There were no blood spatters on the clothes, the type of evidence you might expect to see. That testing on the boot was not done until sometime in December, when the boot was sent up to — I understand first it went to Seattle and then down to an expert in Oregon, I think, is the route that it took. Or it might be visa-versa [sic], but that didn't occur until December. Now, we're talking back in May, right after the arraignment. There was no evidence at the time, no physical evidence, no gunpowder, no blood. I had a client telling me that he was not there, that he was elsewhere. The statutory mitigating factors rather all speak in terms of someone who was there and who did it. At the time I had what I thought was a very defensible case, from a believable client, with no physical evidence. And under circumstances like that, you don't go to the

prosecut[or] and say, well, when he did it, he did it with the consent of the victim, or that he was acting under duress, or any of the statutory factors. That was inconsistent with the case that I was presented with.

Report of Proceedings, at 259, 262-63.

In this light, the defendant's ineffective assistance argument may be said to characterize as negligent what was actually a strategic decision by trial counsel. *See In re Jeffries, supra* at 332-33. There is a strong presumption that counsel has rendered adequate assistance and has made all significant decisions in the exercise of reasonable professional judgment. *Lord,* at 883. "If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel." *Lord,* at 883. Obviously defense counsel's judgment may include wishes of the defendant:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on *informed strategic choices* made by the defendant and on *information supplied* by the defendant.

(Italics ours.) *In re Jeffries,* at 332-33 (quoting *Strickland,* 466 U.S. at 691). It is now evident that Mr. Clower relied for his approach to the case upon a dishonest version of events handed him by Benn.

Even if we assumed arguendo that Mr. Clower's conduct failed the first prong of *Strickland,* Benn has not satisfied the second *Strickland* prong by showing there was a reasonable probability of a different outcome *but for* Mr. Clower's decision not to present additional evidence. No additional mitigating evidence was presented at the end of the case in the penalty phase; nor does Benn demonstrate there was any additional mitigation to offer.

We hold Benn was not denied effective assistance of counsel prior to the filing of the notice to seek a special sentencing proceeding.

### Ineffective Assistance During the Penalty Phase

Benn also claims he received ineffective assistance of counsel during the penalty phase of his trial.

Under *Strickland*, a defendant is deprived of effective assistance of counsel at trial if the attorney's conduct falls below an objective standard of reasonable conduct and if there is a probability that the outcome would have differed but for the substandard conduct of the attorney. 466 U.S. at 687-88, 694. We apply the *Strickland* standard to death penalty proceedings. *Burger v. Kemp*, 483 U.S. at 788-89; *In re Jeffries*, 110 Wn.2d 326, 332, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988).

In *In re Jeffries*, *supra*, this court held that a defendant was not denied effective assistance of counsel when counsel followed the defendant's wishes and brought no mitigating evidence to the penalty phase.[6] Here, the record indicates that trial attorney Raymond Thoenig was prepared, *in spite* of Benn's initial wishes, to present mitigating evidence. Mr. Thoenig operated as effective standby counsel after the court initially granted Benn's motion to proceed pro se for a brief period in the penalty phase. Benn, therefore, cannot meet the first *Strickland* prong.

Nor can he satisfy the prejudice prong. As noted above, the same mitigation evidence regarding Benn's character and the effect of his loss to his family was offered during the penalty phase as was offered before the beginning of trial. Benn fails to suggest any additional mitigation evidence counsel could have offered, nor does he claim that counsel improperly presented prejudicial evidence.

### Mandatory Death Sentence Contention

Benn contends the procedures of RCW 10.95 unconstitutionally impose a mandatory sentence of death. We note at

---

[6]We note that the United States Supreme Court has declined to hear arguments in a California case holding that a defendant who insists that mitigating evidence not be presented at the penalty phase of a capital case is estopped from later claiming ineffective assistance based on counsel's acquiescence in his wishes. *People v. Deere*, 53 Cal. 3d 705, 808 P.2d 1181, 280 Cal. Rptr. 424 (1991), *cert. denied*, ___ U.S. ___, 117 L. Ed. 2d 122, 112 S. Ct. 954 (1992).

this point that this argument and several to follow are raised in spite of having been previously rejected by this court. The Brief of Appellant, at 52-53, states the following:

> Many of the issues addressed in the following sections have been discussed in prior decisions of this court. Nonetheless, counsel's duty to raise all potential issues in a death penalty case requires that they be dealt with here. In addition, the doctrine of procedural forfeiture employed by the federal courts requires that defendant give state courts the opportunity to resolve these issues in his favor.

Accordingly, as many issues in this appeal have been squarely decided by this court on previous occasions, they are addressed when presented in this appeal by brief reference to controlling authority.

 ▮ This court has repeatedly held that RCW 10.95 does not impose a mandatory sentence of death. *State v. Campbell*, 103 Wn.2d 1, 27-28, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *State v. Bartholomew*, 101 Wn.2d 631, 647, 683 P.2d 1079 (1984); *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Lord*, 117 Wn.2d 829, 916, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992). The Ninth Circuit has also rejected this challenge to our statute, *Campbell v. Kincheloe*, 829 F.2d 1453 (9th Cir. 1987), and the Supreme Court has rejected identical challenges to similar statutes. *See Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990); *Boyde v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990).

### Unconstitutional Delegation to Prosecution by Legislature

 ▮ Benn argues that RCW 10.95 represents an unconstitutional standardless delegation of authority to the prosecution. This court has repeatedly rejected the argument that through RCW 10.95 the Legislature has delegated authority without adequate standards to guide its exercise by the prosecution. *See State v. Campbell, supra* at 26; *see also State v. Lord, supra* at 916 (rejecting void for vagueness challenge); *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984).

### Improper Charging of Defendant

 Benn contends he was improperly charged by means of an information and separate notice of intent to seek a special sentencing proceeding. This court has repeatedly rejected the argument that capital defendants should be charged by indictment rather than by information. *See State v. Jeffries, supra* at 424; *State v. Ng*, 104 Wn.2d 763, 774-75, 713 P.2d 63 (1985); *see also State v. Lord, supra* at 916.

### Presumption of Innocence

Benn argues that RCW 10.95 violates the requirement of the presumption of a defendant's innocence. Benn argues that this court's holdings in *State v. Jeffries, supra,* and *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986), that the presumption of defendant's innocence does not apply to sentence enhancement proceedings, are in conflict with the fundamental principle that a defendant enjoy the presumption of innocence. Benn argues absence of this presumption discourages leniency.

Benn also challenges the principle that it is the defendant's burden to provide mitigation evidence to the prosecution prior to a filing of a notice of a special sentencing proceeding, as such a burden vitiates the presumption of leniency.

 The presumption of innocence does not apply to the penalty phase in special sentencing proceedings. This is so because these proceedings would not occur absent a jury verdict of *guilty* of aggravated murder. However, this dictate of logic in no way denies the presumption of leniency in the penalty phase of trial. We observe that the Supreme Court has held it constitutional to require a defendant to prove mitigating factors in a sentencing proceeding. *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990).

In any event, Benn's jury was instructed that a presumption of leniency applies to the penalty phase, and the State acknowledges this presumption. *See Jeffries*, 105 Wn.2d at

425; *Mak,* 105 Wn.2d at 755-56. We accordingly reject this assignment of error.

### Jury Comprehension of Question Before It

Benn argues that the jury in the penalty phase of his case was incapable of answering the question before it.

The Washington death penalty statute requires the jury to answer the following question:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

RCW 10.95.060(4). Benn claims the statutory language does not precisely channel jury discretion and "promotes unequal administration of law . . . as the sentencing jury cannot comprehend the question it is called upon to answer. *But, See, State v. Dictado".* Brief of Appellant, at 100.

The defendant himself acknowledges that available authority (*State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984)) is contrary to the proposition advanced.

■ This court has previously stated that the particular question which is put to the jury as mandated by statute under RCW 10.95.060(4) satisfies due process and the Eighth Amendment. *See Jeffries,* 105 Wn.2d at 422-23; *Campbell,* 103 Wn.2d at 28; *Bartholomew,* 101 Wn.2d at 647; *Rupe,* 101 Wn.2d at 709.

### Instruction Error

Benn argues the instructions in the penalty phase in his case precluded consideration of mitigating factors.

■ This court has repeatedly rejected the contention that because the jury does not make separate findings on each mitigating factor, meaningful appellate review is frustrated. *See State v. Jeffries, supra* at 426-27; *State v. Lord, supra* at 915-16. The Supreme Court has held that juries need not make findings of fact regarding aggravating or mitigating circumstances either considered or found. *Hildwin v. Florida,* 490 U.S. 638, 104 L. Ed. 2d 728, 109 S. Ct. 2055 (1989); *Clemons v. Mississippi,* 494 U.S. 738, 108 L. Ed. 2d 725, 110

S. Ct. 1441 (1990). Furthermore, the Supreme Court has held that jurors cannot be required to agree unanimously as to any particular mitigating factor and, rather, must be allowed to make an evaluation as individuals in this regard. *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988); *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990). The requirement of unanimous finding as to the presence of mitigating factors would impermissibly limit the jury's consideration of mitigating evidence in violation of the Eighth Amendment. *McKoy*, 494 U.S. at 438-39.

Legislative Encroachment on the Executive

Benn argues that Washington's death penalty statute constitutes an encroachment by the Legislature on the power of the executive.

The defendant attacks the Legislature's authority to prescribe sentencing procedures under RCW 10.95. This authority is legitimately exercised as part of the Legislature's constitutional duty to provide adequate guidelines for the exercise of prosecutorial discretion in death penalty cases. Standard setting of this type is required of the Legislature. *See State v. Bartholomew*, 104 Wn.2d 844, 849, 710 P.2d 196 (1985).

The exercise by the Legislature of legitimate authority to prescribe sentencing procedures in death penalty cases, coupled with its responsibility to provide adequate standards to guide the exercise of a prosecutor's discretion, is not an encroachment on the executive branch.

The limited powers of the executive in sentencing are a delegation from the Legislature. The power of the Legislature over sentencing is plenary; the fixing of legal punishments for criminal offenses is part of "the acknowledged power of the legislature to provide a minimum and maximum term within which the trial court may exercise its discretion in fixing sentence". *State v. Le Pitre*, 54 Wash. 166, 169, 103 P. 27 (1909). *See State v. Ammons*, 105 Wn.2d 175, 713 P.2d 719, 718 P.2d 796, *cert. denied*, 479 U.S. 930 (1986).

This court has specifically recognized that the Legislature's power to set sentence parameters under RCW 10.95 entails the power to prescribe sentencing procedures. *See State v. Jeffries*, 105 Wn.2d at 424. To argue otherwise flies in the face of the inherently (and wisely) limited authority of the prosecution in the death sentence context:

> [T]he prosecutor participates in the sentencing process by choosing to request a special sentencing proceeding. But the prosecutor can neither impose the sentence nor require that it be imposed. . . . [T]he prosecutor's discretion in this regard is similar to his discretion in charging a crime: *"The prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of mitigation to the jury." Dictado*, at 298. The sentencing jury or the judge determines whether the statutory conditions to impose the death penalty are met. RCW 10.95.050(2), .060(4), .080. Moreover, automatic review by the Supreme Court again insures that sentencing remains a judicial function.

(Citation omitted. Italics ours.) *State v. Campbell*, 103 Wn.2d at 26.

Benn finds fault in RCW 10.95.050(1), which bars the prosecution from consenting to a plea, making an admission, or entering into any agreement abrogating the requirement that a special sentencing proceeding be held. The powers of the executive in sentencing are delegated by the Legislature. The Legislature has determined that once a special sentencing notice has been filed, and the defendant has been found guilty of aggravated murder, the question of whether mitigation is sufficient to merit leniency remains with the judiciary. This distribution of authority does not violate the separation of powers doctrine. The Legislature is constitutionally required to set guidelines and limits on the exercise of discretion by the prosecution in this regard. *State v. Bartholomew*, 104 Wn.2d 844, 848-49, 710 P.2d 196 (1985):

> To allow the prosecution [unfettered] discretion in a death penalty case absent specific statutory guidance could also give an unconstitutional delegation of authority to the prosecutor. . . . The "discretion" the prosecutor possesses at the charging stage is narrowly focused. The prosecutor can only follow the statutory instructions.

(Citation omitted.) In *Bartholomew*, at 850, we concluded:

> The prosecution has no right, statutory or constitutional, to usurp the jury's functions to determine *mitigation* in this case, and make the decision whether the defendant should live or die. The prosecutor does have the right to appear before the jury and ask for mitigation and the sparing of defendant's life. The final decision, however, will rest with the jury, subject to review by this court.

We reject Benn's argument of legislative encroachment on prosecutorial discretion as that discretion is bordered by the necessary limits of the legislative and judicial provinces.[7]

### Legislative Encroachment Upon Judiciary

Benn argues that Washington's death penalty statute constitutes an encroachment by the Legislature upon the powers of the judiciary.

█ This court has previously rejected this contention. *See State v. Jeffries*, 105 Wn.2d 398, 424, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *see also State v. Lord*, 117 Wn.2d 829, 915-16, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992).

### Equal Protection

Benn argues that RCW 10.95 violates equal protection.

█ This court has repeatedly rejected the contention that the prosecution has an unconstitutional latitude in deciding whether to seek the death penalty under RCW 10.95. *See State v. Harris*, 106 Wn.2d 784, 793-94, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987); *State v. Dictado*, 102 Wn.2d 277, 297-98, 687 P.2d 172 (1984); *State v. Campbell*, 103 Wn.2d 1, 25, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *State v. Rupe*, 101 Wn.2d 664, 699, 683 P.2d 571 (1984); *see also State v. Lord, supra* at 915-16.

The reliance by the defendant on *State v. Zornes*, 78 Wn.2d 9, 475 P.2d 109 (1970) is misplaced. *Zornes* is no longer the law. *See Kennewick v. Fountain*, 116 Wn.2d 189,

---

[7]We hold that in Benn's case the prosecution did offer to request the court to withdraw the special sentencing notice before trial in exchange for Benn's plea of guilty to two counts of aggravated first degree murder. Benn's attorneys rejected this offer and instead offered a plea to two counts of first degree murder which was not accepted.

802 P.2d 1371 (1991) (citing *United States v. Batchelder*, 442 U.S. 114, 60 L. Ed. 2d 755, 99 S. Ct. 2198 (1979)).

### Double Jeopardy

Benn argues that RCW 10.95 violates the prohibition against double jeopardy.

Benn asserts that the imposition of the death penalty in cases of aggravated murder violates the prohibition against double jeopardy since the penalty for such an offense has already been enhanced to life imprisonment without parole. This argument is without merit. The death penalty statute does not impose multiple punishments for the same offense. It does authorize enhancement of the punishment for aggravated first degree murder based on proof of additional facts (insufficient mitigating circumstances to merit leniency). Double jeopardy is not violated by further sentence enhancement upon an additional finding of insufficient mitigating factors. *Missouri v. Hunter*, 459 U.S. 359, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983).

### Inadequate Definition of Instruction Terms

Benn argues for the first time on appeal that key terms in the jury instructions were not adequately defined. The terms in question include "common scheme or plan", "single act", and "leniency". The defendant argues the definitions provided for these terms are void for vagueness.

In *State v. Fowler*, 114 Wn.2d 59, 785 P.2d 808 (1990), however, this court rejected the defendant's assertion for the first time on appeal that the term "unlawful force" as defined by the trial court's jury instructions was unconstitutionally vague or overbroad. While the defendant in *Fowler* argued he could raise a vagueness or overbreadth objection to a jury instruction for the first time on appeal, since the error alleged was of constitutional magnitude this court rejected this argument, relying on *State v. Scott*, 110 Wn.2d 682, 689, 757 P.2d 492 (1988). *Fowler* states that under *Scott*, the constitution only requires trial courts to instruct the jury as to each element of an offense charged, and thus an insufficient definition of an instruction is not

an issue of constitutional magnitude which may be raised for the first time on appeal:

> Fowler argues in the alternative that he can raise a vagueness or overbreadth objection to the instruction for the first time on appeal since such error is of constitutional magnitude. However, in *State v. Scott*, 110 Wn.2d 682, 689, 757 P.2d 492 (1988), this court held the constitution only requires the jury be instructed as to each element of the offense charged, and the failure of the trial court to further define one of those elements is not within the ambit of the constitutional rule. Since the trial court did instruct the jury as to each element of second degree assault, it met its constitutionally mandated requirement. Fowler has not raised an issue of constitutional magnitude to this court.

*Fowler*, at 69-70. *See also Lord*, at 894-95 (rejecting claim not of constitutional magnitude).

██ Even if this court were to consider this issue, we have previously rejected this argument as applied to the term "common scheme or plan". *See State v. Jeffries*, 105 Wn.2d at 420:

> Defendant also claims that the phrase "common scheme or plan" also should have been defined. In instruction 7 the jury was simply told to decide whether there was a scheme or plan involved; such a simplistic request needs no definition. No error was committed.

The same reasoning applies as well to "leniency" and "single act". *See Harris*, 106 Wn.2d at 793; *Campbell*, 103 Wn.2d at 28; *Bartholomew*, 101 Wn.2d at 647 ("mitigating circumstances" does not require specific definition).

Benn relies on *Maynard v. Cartwright*, 486 U.S. 356, 361, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988) and *Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980), in support of his contention that the complained of terms fail to channel jury discretion. *Maynard* and *Godfrey* are inapposite. In *Maynard*, the offending words were "especially heinous, atrocious or cruel". In *Godfrey*, the offending words were "outrageously or wantonly vile, horrible and inhuman". These are inflammatory, subjective, descriptive terms regarding acts of defendants. The vagueness danger in such terms is evident — jury discretion is set rampant by such language.

By contrast, the term "single act" is neither emotionally charged nor prone to subjective standards. The term "leniency" could hardly be clearer to the jurors in guiding their discretion. In the context of the question the jurors were asked, "leniency" simply means a sentence other than death, which the jurors were told would be life without parole.

### Right To Remain Silent

Benn argues that the State violated his right to remain silent during the penalty phase of trial.

While exercising his right of allocution, Benn began telling his version of what had happened leading up to the murders on February 10, 1988. The State objected:

> Your honor, the State's going to object at this time. This is not proper allocution. If the defendant wishes to give testimony, he may be sworn and take the stand, but he far exceeded the requirements and purpose of allocution.

Report of Proceedings, at 2281-82.

Benn argues that this remark improperly commented on his silence during the guilt phase in violation of the Fifth Amendment. As a preliminary matter, it should be noted that the court overruled the State's objection and allowed the defendant to continue in his own manner.

Moreover, the prosecutor's remark was not a comment on Benn's silence during the guilt phase but rather on the fact that Benn was then beginning to testify as to what "really" happened. This was an appropriate comment. Allocution is a defendant's personal plea for mercy. If the defendant instead offers a version of the facts or disputes evidence, the defendant is offering testimony, not making a plea for mercy. *Lord*, at 897. It is entirely correct for the prosecution to object to a defendant's violation of the proper bounds of allocution. *See Lord*, 117 Wn.2d at 946 (Utter, J., dissenting). But even if the prosecution in Benn's case did, in effect, comment on Benn's guilt phase silence, this did not violate his constitutional rights. *Jeffries*, 105 Wn.2d at 415-16.

### Prejudicial Closing Argument

Benn argues the prosecutor's closing argument in the penalty phase was improper and prejudicial.

 The defendant bears the burden of establishing not only the impropriety of the prosecutor's remarks, but also a substantial likelihood that those remarks affected the verdict. *Mak*, 105 Wn.2d at 726. Benn has not met these burdens with respect to any of the challenged comments.

 First, the prosecutor's reference to all jurors and attorneys as "officers of the court" merely charged the jurors not to be guided by emotion. This was proper. *In re Rupe*, 115 Wn.2d 379, 390, 798 P.2d 780 (1990).

Next, the prosecutor did not argue that the jury could not consider nonstatutory mitigating factors in reaching its verdict. The prosecutor argued only that Benn's family's love for him was not sufficient to merit leniency in view of the nature of Benn's crimes. The prosecutor's reference to the joint involvement of the defendant and victims in insurance fraud was based on properly admitted evidence and was not calculated to arouse the passions of the jury.

The trial court sustained Benn's objection to the prosecutor's reference to the 1962 or 1963 yearbook pictures of the victims, and the jury was instructed not to consider this statement. The remark was not prejudicial in any event. The prosecutor was merely responding to the defense's use of a 1964 yearbook, in which Benn's picture also appeared, to show that the victims and defendant were familiar with each other.

In sum, the remarks Benn challenges either were not improper or were stricken.

### Sufficiency of Aggravation Evidence
### To Rebut Mitigation

Benn claims there is insufficient evidence to support the jury's finding that there are not sufficient mitigating circumstances to merit leniency.

This issue stems from the first question of a 3-question inquiry this court must complete as part of its statutorily mandated review of all death sentences:

> (a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . and

(c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2).

██ Under the sufficiency of the evidence analysis required under subsection (a), this court must determine if:

> " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt.' " *State v. Rupe*, 108 Wn.2d 734, 765, 743 P.2d 210 (1987) (quoting *State v. Mak*, 105 Wn.2d 692, 761, 718 P.2d 407, *cert. denied*, 107 S. Ct. 599 (1986)).

*State v. Rice*, 110 Wn.2d 577, 623, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

This court applied this standard in *State v. Lord*, 117 Wn.2d at 905-07, in independently considering mitigating and aggravating circumstances. Mitigating circumstances considered in Lord's case were the love of family and friends who would visit the defendant in prison, the defendant's age (26) at the time of sentencing, his talent as a carpenter, the lack of family support in helping Lord understand an earlier homicide conviction, the observations offered that Lord would do well in a structured prison environment, impossibility of release from a life without parole sentence, head injuries from an auto accident prior to the commission of aggravated murder, and an antisocial personality disorder. This court held:

> Viewed in the context of the totality of the evidence, these mitigating circumstances are relatively unpersuasive. "[T]he mere presence of mitigating factors does not require a jury to grant leniency, so long as it is convinced beyond a reasonable doubt that any mitigating factors are outweighed by the circumstances of the crime." *Rice*, at 624. Here, there was sufficient evidence to warrant the jury's decision.

*Lord*, at 906. The aggravating factors which outweighed mitigation evidence in Lord's case were rape and brutality of the murder of the 16-year-old victim and Lord's two prior convictions of violent crimes: second degree murder and un-

lawful imprisonment through menace. The defendant's lack of remorse was also noted.

Benn offered very little evidence relating to the statutory mitigating factors. He did, however, present evidence of his previous good character, the affection of family members, and the loss to his loved ones if he were sentenced to death.

On the other side of the equation, the only aggravating factor in Benn's case is multiple victims.

Comparing Benn's case to Lord's, there were more aggravating circumstances in *Lord* than here; but Lord also presented more mitigating evidence than Benn. As has previously been indicated, from the pretrial stage Benn's attorney decided to limit the presentation of mitigation, initially as a matter of trial strategy. Nevertheless, Benn has not demonstrated that other significant mitigating evidence remains unpresented. Based on the evidence presented, a rational trier of fact could find that there were insufficient mitigating circumstances to merit leniency for the premeditated executions of two men. The jury's finding on this issue will not, therefore, be disturbed. *State v. Rice, supra* at 623.

Proportionality Review

Benn argues the imposition of the death penalty in his case was not proportional as required under RCW 10.95-.130.

RCW 10.95.130(2)(b) requires this court to determine:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120 . . .[.]

Under RCW 10.95.120, trial courts must file with this court reports "[i]n all cases in which a person is convicted of aggravated first degree murder". The pool of "similar cases" includes those cases in which the death penalty was sought and those in which it was not. *State v. Lord,* 117

Wn.2d 829, 907, 822 P.2d 177 (1991), *cert. denied,* 113 S. Ct. 164 (1992). In *Lord,* this court traced the development of proportionality review in Washington, adopted as a response to *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). *Furman* prohibits imposition of death sentences by procedures which create a substantial risk that death will be imposed in an arbitrary and capricious manner. *Lord,* at 908 (citing *Gregg v. Georgia,* 428 U.S. 153, 188, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh'g denied,* 429 U.S. 875 (1976)). Although proportionality review is not constitutionally required, it provides a safeguard against arbitrarily imposed death sentences. *Lord,* at 908 (citing *Lewis v. Jeffers,* 497 U.S. 764, 779-80, 111 L. Ed. 2d 606, 622, 110 S. Ct. 3092 (1990)).

In *State v. Harris,* 106 Wn.2d 784, 725 P.2d 975 (1986), *cert. denied,* 480 U.S. 940 (1987), this court adopted the following test for the difficult determination of whether a death sentence is proportionate:

> [T]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not "wantonly and freakishly imposed," . . .[.]

*Harris,* at 798 (quoting *Moore v. State,* 233 Ga. 861, 864, 213 S.E.2d 829 (1975)).

It has been noted in commentary that the statutorily mandated proportionality review involves a paradox. *See* Comment, *Washington's Comparative Proportionality Review: Toward Effective Appellate Review of Death Penalty Cases Under the Washington State Constitution,* 64 Wash. L. Rev. 111, 121 (1989). This court is directed to determine whether the death sentence in a particular case is proportional to sentences imposed in "similar" cases. But this review process often involves "the comparison of incomparables" as some acts of murder are qualitatively distinct or unique. *See* 64 Wash. L. Rev. at 121.

In *Lord*, this court stated its concern in proportionality review is in avoiding two systemic problems in death sentencing: first, random arbitrariness; and second, death sentences based on the race of the defendant. *Lord*, at 909. In comparing "similar" cases, the *Lord* analysis rejected an approach to proportionality review involving a test for a matching number of identity points: "Crimes . . . are unique and cannot be matched up like so many points on a graph." *Lord*, at 910. Instead this court analogized the proportionality review to a search for family resemblances, a more impressionistic approach:

> Our review is not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances. As we explained in a prior case:
>
>> Simply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it.
>
> *In re Jeffries*, *supra* at 490. Requiring precise uniformity would not only be unworkable, it would effectively eliminate the death penalty. Indeed, the jury is directed to tailor its decision to the individual circumstances of the crime. A jury could decline to impose the death penalty because a particular defendant deserves mercy. However, the decision to afford one defendant mercy, and yet not another, does not violate the constitution.

*Lord*, at 910. In arriving at the conclusion that Lord's death sentence was not disproportionate or excessive, we considered the nature of Lord's crime, the aggravating factors, and Lord's prior convictions and personal history.

We compare Benn's case (the nature of his crime and aggravating factor, his prior convictions and personal history) to the pool of similar cases required by RCW 10.95-.120.

We first consider the crime of which Benn was convicted. Benn, at age 42, murdered two adult males, Jack Dethlefsen, aged 46, and Mike Nelson, aged 45. It is an unfortunate reality that many of the cases reporting aggravated first

degree murder convictions since 1965 involved two or more victims. Historically, in conducting the statutory proportionality review, this court has compared each case to others in which the same aggravating factor was proven. *See State v. Jeffries*, 105 Wn.2d 398, 430, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Harris*, 106 Wn.2d 784, 798-99, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987); *State v. Rupe*, 108 Wn.2d 734, 768-69, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *State v. Rice*, 110 Wn.2d 577, 626, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). *Lord* adopts a somewhat broader approach. *Lord*, at 910-11. In order to identify the cases which most resemble Benn's, we present summaries from reports involving multiple murders. By beginning with this subset of all cases reported since 1965, we do not mean to suggest that we consider all of these to be "similar cases" to Benn's for the purposes of the proportionality review. Rather, we will use this characteristic initial common denominator as a point of departure in our search for family resemblances and similar cases.

Thomas Baja (No. 59),[8] at the age of 43, murdered his ex-wife and her male companion after entering her home. The State alleged and the jury found that Baja shot both victims in the head as part of a common scheme or plan. There was no torture or hostage element to the crime. Baja suffered from posttraumatic stress disorder and Baja's crime appears to have been one of passion. The death penalty was not sought, and Baja received a sentence of life without parole.

Gregory Brown (No. 12), while 25 years of age, murdered his 17-year-old common law wife (and mother of his child) and her 22-year-old uncle. Both were killed with a handgun as part of a common scheme or plan. Brown's wife was shot several times in the head; her uncle was shot several times as well. As with Benn, the aggravating factor found was multiple victims murdered as part of a common scheme or

---

[8]The numbers referenced here are the sequential numbers assigned to the trial court's reports as they are received by this court.

plan. There was no evidence of torture. Brown had a criminal record. He was diagnosed as paranoid schizophrenic. The death penalty was not sought, and Brown received life without parole. Brown's mental illness is a significant mitigating factor which serves to distinguish his case from Benn's.

Henry Dailey, Jr. (No. 108) and David Simmons (No. 107) were codefendants. They were convicted of conspiracy to commit murder as well. Aggravating factors in these cases were multiple victims as part of a common scheme or plan, and murders were committed in furtherance of a robbery and committed to conceal the identities of the defendants. Dailey was 22 at the time of the offense and Simmons was 42. Both had prior records. The victims were a Mr. and Mrs. Crabtree. Mr. Crabtree was a contractor and an acquaintance of Simmons. The defendants shot him. Mrs. Crabtree was strangled to death with a belt. There was no evidence of torture, but the report indicates the victims were hostages for a short time. The death penalty was not sought in either case and both Dailey and Simmons were sentenced to life without parole.

Charles Defrates (No. 32) was 46 when he murdered his brother's wife, age 21, and her brother, age 20. He pleaded guilty to the murders, and the prosecutor dropped the death notice filing in exchange for the plea. The victims had been held hostage. Defrates had a prior record. Defrates was sentenced to life without parole. Aggravating circumstances were murders for concealment and multiple victims as part of a common plan.

Westley Allan Dodd (No. 76), at the age of 28, killed three victims, all children. No mitigating evidence was presented; aggravating circumstances were concealment, multiple victims, rape and kidnapping. Dodd pleaded guilty. There was evidence that the victims were tortured. Dodd was diagnosed as having a behavior disorder and being a sexual deviant. The death penalty was sought and imposed by the trial court. We reject any notion that Benn's case and Dodd's are similar.

Charles Campbell (No. 9), like Dodd, was sentenced to death for extremely brutal crimes. There were three victims, ages 8, 31 and 51. There were at least five aggravating factors: Campbell murdered while serving time, as part of a common scheme, killed a witness, murdered to protect his identity, and murdered during a burglary. No mitigation was presented. The victims were tortured. These extremes are not present in Benn's case, and we reject any notion that Benn's case and Campbell's are similar.

Gregory Fish (No. 96) was 28 at the time he murdered his estranged wife and sister-in-law. He pleaded guilty and the death penalty was not sought. Aggravating circumstances were concealment, multiple victims and burglary. Fish had a prior record, was a long-term drug abuser, and was diagnosed as having an antisocial personality. The crime could be fairly characterized as one of passion. Prosecution and defense stipulated to mitigating circumstances. Fish was sentenced to life without parole.

Pompeyo Guloy (No. 5) was a codefendant of Jimmy Ramil (No. 4), Constantine Baruso (No. 112), and Fortunato Dictado (No. 22). The State did not seek the death penalty in the cases of any of these defendants. Their victims were rival union officials. The only aggravating circumstance was multiple victims in a single event. The death penalty was not sought, thus no mitigating factors are listed in the report. There were no aspects of torture or hostage taking. The purpose of the killings was elimination of the victims as rivals. Both victims were adult males, age 29. One died instantly and one was shot 3 or 4 times and lived for about 13 hours. Guloy had no known prior record. Ramil and Dictado had prior felony convictions. Baruso had prior federal felony convictions. These defendants received life without parole.

Clark Hazen (No. 39) was 18 at the time of his crime. He murdered two neighbors whom he knew only slightly, a 65-year-old retired man and his 27-year-old nurse. Both were shot in the head. Aggravating circumstances were conceal-

ment and murder in furtherance of robbery and rape. No common scheme or plan was found. Mitigating factors offered were the youth of the defendant, history of his being abused as a child, and an organic brain dysfunction. The death penalty was sought and imposed at trial.[9]

Darrin Hutchinson (No. 68) shot two Island County Sheriff's deputies in the head at close range. The aggravating factor of common scheme or plan for multiple murders was found. The defendant was 26 and had a prior record. He shot the officers when stopped for a DWI arrest. Mitigation offered was a defendant IQ of only 79, intoxication at the time of the crime, and a history of abuse as a child. Death was sought, but the defendant was sentenced to life without parole. The mental disability and intoxication of the defendant in this case strongly distinguishes it from Benn's.

Patrick James Jeffries (No. 15) murdered a husband and wife while he was their houseguest. Aggravating factors found were concealment of identity and multiple victims as part of a common scheme or plan. The victims were adults in their fifties. Jeffries, who was in his forties at the time of the crime, had a prior record. Offered in mitigation was Jeffries' artistic talent. The death penalty was sought and imposed. The scant mitigation offered in Jeffries' case is significant in comparison with Benn's case.

William Kincaid (No. 16) shot his estranged wife, age 24, and her sister, age 26, with a shotgun. Kincaid was convicted of aggravated murder and second degree murder. The sole aggravating circumstance found was multiple victims as a result of a single act. Mitigation was that Kincaid had been out of work 2 years and attempted suicide after the murders. The death penalty was not sought and the defendant was sentenced to life without parole.

Minviluz Macas (No. 101) set fire to her house, killing her 85-year-old husband and her children, ages 9 and 11. Aggravating circumstances were multiplicity of victims and

---

[9]We note that Hazen killed himself in prison before either his conviction or sentence could be reviewed.

arson. She had no prior record. The death penalty was not sought.

Kwan Fai Mak (No. 13), along with Benjamin Ng (No. 14), was convicted in the murder of 13 victims (12 men and 1 woman). Aggravating factors were multiple victims, robbery furtherance, and concealment. Each defendant pointed to the other as the killer. The victims were hog-tied prior to their executionlike murders and one was beaten. Mak had no prior record. Eyewitness testimony suggested the State's main witness may have been wrong in describing Mak's role in the crime. Mak was 23 at the time of his conviction. Death was sought and imposed by the trial court on all 13 counts against Mak. Ng presented mitigating evidence of diminished capacity, youth, and lack of a prior record (only second degree theft). Ng was sentenced to 13 terms of life without parole. Due to the extreme number of victims in this crime, we do not find Mak's and Ng's cases similar to Benn's.

William Gary Martin (No. 20) entered the home of his victims and shot them, one in the head and one in the chest. Aggravating circumstances were multiple victims during a burglary. The victims, Mr. and Mrs. Tillman, were the parents of Martin's former fiancée. Martin blamed them for the breakup. Mitigating evidence presented was limited prior criminal history, youth of defendant (around 20 at the time of the murders), diminished capacity, and emotional disturbance. The State sought the death penalty. The jury was unable to reach a unanimous verdict. Martin was sentenced to life without parole. Martin's youth and state of mind at the time of the murder distinguish his case from Benn's.

Mark McKinley (No. 105) murdered his common law wife and her mother. The sole aggravating circumstance found was multiple victims. The death penalty was not sought. McKinley received a sentence of life without parole.

Russell McNeil (No. 61) (codefendant of Herbert Rice, No. 70) was only 17½ at the time of his arrest. McNeil pleaded guilty prior to trial. Aggravating circumstances were con-

cealment, multiple victims and burglary. McNeil killed his male and female victims with a knife. Both were elderly people and were badly mutilated. The youth of the defendant was entered in mitigation. McNeil's sole prior offense was a second degree burglary. The State did not seek the death penalty.

William Pawlyk (No. 116) murdered two victims, his ex-girlfriend and her boyfriend. The aggravating circumstance was multiplicity of victims. This crime was characterized as a crime of passion. Torture was a possibility in the murders. Pawlyk had no prior record. Death was not sought, and Pawlyk pleaded insanity. He received a sentence of life without parole.

Rick Peerson (No. 86) murdered two persons who had sold marijuana to him. Peerson had held the victims hostage, and one of the murders involved torture. The victims were beaten to death with various objects. Aggravating factors were multiple victims, robbery, and prior criminal record. Mitigation was offered that Peerson suffered from brain damage after a car accident which caused a head injury. Posttraumatic stress disorder was also offered as mitigation. The State sought the death penalty. The jury sentenced Peerson to life without parole.

Kenneth Peterson (No. 42) murdered a husband, age 30, and wife, age 24. The wife had to drive with Peterson to a graveyard after Peterson murdered her husband. She was shot twice. Multiple victims was the sole aggravating circumstance. A diagnosis that Peterson was psychotic and his artistic skills were offered as mitigation. The State sought the death penalty. The jury was unable to agree. Peterson was sentenced to life without parole. Psychosis of this defendant is a factor which distinguishes this case from Benn's.

Shawn Dee Reite (No. 84) was 20 at the time she murdered her adopted mother and boyfriend while they slept. Both were shot in the head. Aggravating circumstance was multiplicity of victims. Death was not sought by the State. Reite received a sentence of life without parole.

Herbert Rice (No. 70) (not to be confused with David Rice), at the age of 17, brutally murdered an elderly couple.

Aggravating circumstances found were concealment, multiple victims, killed during burglary and robbery. The victims were stabbed and tortured while aware that the other was suffering. Mitigation offered was youth, limited criminal history and extreme emotional disturbance. The jury could not agree as to the death sentence sought by the State. Rice received a sentence of life without parole. The judge commented in his report he thought the sentence was inappropriately lenient. We distinguish Rice's case based on the defendant's age of 17.

David Rice (No. 43) murdered two adults and two children ages 12 and 10. All four victims were bludgeoned and stabbed to death. Aggravating factors were multiple victims, concealment and murder during felony. Rice was 27 at the time. There was evidence of torture. Mitigation offered was psychiatric testimony of a behavior disorder. Rice had a record including grand theft auto and lewd conduct. He was sentenced to death.

Stanley Runion (No. 99) murdered three people in a drug-related incident. One victim was a child, age 16; the others were adults ages 34 and 23. The sole aggravating factor was the multiplicity of victims as part of a common scheme or plan. Runion had a prior record, including assault with a deadly weapon. Evidence showed the victims were hostages for less than an hour. The death penalty was not sought. Runion was sentenced to life without parole.

Mitchell Rupe (No. 7, No. 31) was age 27 at the time he murdered two adult female victims during a bank robbery. Aggravating circumstances were concealment, multiple victims and robbery. Mitigation offered was Rupe's lack of any criminal history, his community service, his military service, and lack of other violence in background. Rupe was sentenced to death.

Martin Sanders (No. 81) was 30 at the time he murdered two 14-year-old girls after raping them. Aggravating circumstances were rape, concealment, and multiple victims. Both victims were strangled; one was also bludgeoned with a tire jack. Sanders had a prior record including kidnap,

assault, and sexual intercourse without consent. Sanders pleaded guilty. Death sentence was not sought in exchange for a complete statement by the defendant. The victims' families agreed to the seeking of only life without parole, not capital punishment.

Sean Stevenson (No. 50) was convicted of three murders, but only one was found to be aggravated. The aggravating circumstance was rape. There was evidence of torture. The victims were his stepfather, mother and sister. The death notice was withdrawn, the prosecutor accepting psychiatric opinion regarding the defendant. Stevenson was 16 at the time of the offenses. There was evidence of abuse of the defendant by his stepfather. This case is also significantly distinguishable from Benn's; we rule it out for consideration as a similar case.

Robert Strandy (No. 37), along with an accomplice, murdered two adult male victims ages 39 and 41. Both were tied, gagged and shot in the head. The defendant had spent most of his adult life in prison and knew one of the victims from a drug treatment program. The sole aggravating factor was murder in the course of a robbery. A psychiatric evaluation was performed, although its results were not disclosed. The death penalty was not sought. Strandy was sentenced to life without parole after trial.

Lawrence Sullens (No. 69) was 25 at the time he murdered two adult victims, a husband and wife. The victims' 11-year-old daughter was beaten, shot and left in the house when Sullens started the house on fire. She survived. Aggravating circumstances were concealment and multiple victims. The death penalty was not sought. Sullens received a sentence of life without parole.

James Thompson (No. 53) murdered a couple ages 66 and 71. Aggravating circumstances were concealment, multiple victims and robbery. A sentence of death was sought. Mitigation offered was Thompson's alcoholism and a behavior disorder. Thompson had a prior record of theft and robbery. He beat his male victim. Thompson was sentenced to life without parole.

In comparison, we consider first Benn's crime. *Lord*, at 911. Gary Michael Benn (No. 75) was convicted of two counts of aggravated first degree murder. He murdered two adult males ages 46 and 45 by shooting them in the chest and then shooting them in the back of the head at close range. The sole aggravating circumstance was the multiplicity of victims killed as part of a common scheme or plan. We also consider Benn's personal characteristics. *Lord*, at 912. Statutory mitigating factors were offered regarding Benn's character and the loss to his family if he were executed. Conflicting psychological information as to Benn's competence to proceed with trial was offered by three experts, Dr. Carl Reddick, Dr. Lloyd Cripe, and Dr. Brett Trowbridge. Such testimony did not go to Benn's state of mind at the time of the offenses or mitigate Benn's responsibility for his own acts.

The psychological report by Dr. Cripe indicated "severe borderline and narcissistic personality disorder". The psychological report by Dr. Trowbridge indicated an isolated delusional (paranoid) disorder discussed above and unrelated to the crime. The psychological report by Dr. Reddick indicated Benn was manipulative and malingering. Benn had prior convictions, none involving violence: two first degree theft convictions and one grand larceny conviction. The trial judge's comments on the report mandated by RCW 10.95.120 state: "It was a horrible, brutal crime. The defendant was very manipulative with everyone including his own counsel, psychologists, the court and the jury."

Both parties to this appeal agree that the Campbell, Mak, Rice and Dodd cases differ greatly from Benn's. The State decries what in the appellant's brief was offered as statistical argument for disproportionality. The defense offered statistics without case names: 19 cases in which a defendant killed twice, with the State seeking the death penalty in 12 cases and a death sentence imposed in 4 cases. While decrying statistics, the State countered with its own: 31 cases in which the aggravating factor of multiple victims was alleged, if not proven, with the State *not* seeking death in 17 of those cases. As noted above, this court has previously rejected such an approach:

> Simply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it.

*In re Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990). The State also relies on this language from *In re Jeffries, supra*:

> The proportionality of a particular defendant's death sentence does not depend upon the State's seeking the death penalty in every case, however, or even in some threshold proportion of cases.

*In re Jeffries*, at 489-90. Proportionality review is not an inquiry into sentencing percentage comparisons.

The State offers as instructive six multiple aggravated murder cases where the facts, it suggests, resemble Benn's case: Clark Hazen (No. 39), William Gary Martin (No. 20), Sean Stevenson (No. 50), Darrin Hutchinson (No. 68), Thomas Baja (No. 59), and Gregory Brown (No. 12).

| | |
|---|---|
| Hazen | received the death penalty |
| Martin | jury could not agree/life without parole |
| Stevenson | jury could not agree/life without parole |
| Hutchinson | death penalty notice dismissed |
| Baja | death penalty not sought |
| Brown | death penalty not sought |

The State argues there were mitigating factors present in several of these cases not present in Benn's, explaining why the death penalty was not imposed: In Martin's case, the defendant was 21 years old; in Stevenson's case, the defendant was 16; in Hutchinson's case, the defendant had an IQ of 79, was intoxicated at the time of the offense, and suffered a history of abuse; in Baja's case, the defendant suffered from posttraumatic stress disorder; and in Brown's case the defendant was diagnosed as paranoid schizophrenic.

The State also offers the cases of *State v. Rupe, supra, State v. Jeffries, supra,* and *State v. Rice*, 120 Wn.2d 549, 844 P.2d 416 (1993) (Herbert Rice) for comparison. In *Rupe*

and *Jeffries*, it is argued by the State that more mitigation was offered in those cases than by Benn, yet death was imposed. In *Rice*, severe mental disturbances surrounded the crimes. In the lack of prior violent offenses Benn's case resembles Rupe's, in which death was imposed in spite of a lack of prior criminal record. Benn distinguishes the *Jeffries* death sentence from his own case based on Jeffries' violent history. The defense argues State v. Hazen, Clark County cause 85-1-00322-5 (Apr. 16, 1986) is distinguishable based on the aggravating factor of a brutal rape prompted by Hazen's premeditated goal of reenacting a rape scene in a pornographic film. Regarding *Rupe*, the defendant argues that "[n]one of the facts surrounding the crime in *Rupe* are even remotely similar to those in [Benn's] case." Reply Brief of Appellant, at 94. The disagreements of the State and the defendant as to the applicability of cases to a comparative proportionality review of Benn's sentence highlight the difficulties inherent to the identification of "similar cases".

There are some generally identifiable traits in the RCW 10.95.120 reports which are evident when persons convicted of multiple first degree aggravated murders are not sentenced to death or have avoided the filing of a special sentencing notice for the death penalty. These factors generally involve mental defects or disturbances, or a defendant being youthful, or a plea of guilty. The last factor, involving pleas of guilty such as in the Defrates case (No. 32), indicates remorse or confession of a crime by the defendant may be viewed by prosecutors or juries as significant mitigation. While these factors are not automatic indicators that a death sentence should or should not be applied in a given case, from a comparative proportionality analysis they apparently cause death sentences to be sought or imposed with less frequency. There are exceptions, such as is illustrated by the death sentence in State v. Hazen for a defendant 19 at the date of his conviction, and the sentence against David Rice entered over the mental disturbance mitigation offered.

The case of Gary Benn, however, did not offer any of these personal characteristic factors of youth, mental defect

or disturbance, or a plea of guilty in mitigation of his act of multiple murder. In comparing Benn's case, we find several somewhat similar cases in which the penalty of death was not sought or imposed and several in which it was. Generally, however, in those cases in which the death penalty was either not sought or not imposed upon multiple murder defendants, those cases did not appear to be in the same genus or family as Benn's case and were thus not "similar". By the same token, we would not call the Dodd, Campbell, Mak, or David Rice cases similar to Benn's.

The similar cases we have derived from the above listing for purposes of determining the comparative proportionality of Benn's sentence are: McKinley, No. 105 (murdered girl-friend and her mother, one aggravating factor); Runion, No. 99 (drug-related killing); Strandy, No. 37 (two adult victims shot in head at close range); and Thompson, No. 53 (murdered couple during robbery) in which the defendants were sentenced to life without parole; and Hazen, No. 39 (murdered two neighbors); Jeffries, No. 15 (murdered couple while a guest in their home); and Rupe, No. 7 and No. 31 (murdered two tellers during bank robbery), in which the defendants were sentenced to death.

This group of cases similar to Benn's does not contain an arbitrary frequency of life without parole sentences over death sentences. Even in this group of "similar" cases there are factors making each case unique and thus still not the same as Benn's. We have sought to find a fair group of multiple murder cases for comparison based upon resemblances in aggravating or mitigating factors and overall culpability. We have also taken an analysis focused on resemblances to sentences of life without parole and death sentences rather than only comparing Benn's case to existing death sentence precedents, the latter being an approach of questionable reliability which has been criticized in commentary. We have done so with a view toward detecting and undoing arbitrariness, caprice, or prejudice in the jury's sentence. This court may systematically seek to undo and thus eradicate arbitrariness in sentencing. It will have limited

success, however, in systematizing the unpredictable impulse toward mercy among juries which must decide cases that are ultimately as unique as each defendant. We have not sought to substitute this court's judgment for that of the jury. Having considered both the crime and the defendant as required by statute, we hold Benn's sentence of death to be comparatively proportionate to the sentences imposed in similar cases and not arbitrarily, wantonly or freakishly imposed.

### Passion or Prejudice in Sentencing

Benn argues the sentence of death in his case was imposed as a result of passion or prejudice.

Under RCW 10.95.130(2)(c), the "no passion or prejudice" determination is mandatory. The defendant asserts that this review is a proper context for defense presentation of cumulative trial error. In *State v. Lord*, 117 Wn.2d 829, 914-15, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992), however, we rejected the defendant's reiteration of alleged trial errors addressed in other parts of Lord's appeal as support for a passion or prejudice argument. "Prejudice" for purposes of this statutory review is not to be equated with motions on which the defense was unsuccessful or with situations which in hindsight appear to be strategic errors by the defense. The defendant's claims of error arising from the prosecution's closing argument are addressed above. The State presented no evidence in the penalty phase, and there is no indication that the verdict was the product of passion or prejudice.

### Cruel and Unusual Punishment

Benn argues the death penalty is cruel and unusual punishment.

This argument has been rejected repeatedly by this court, as well as by the United States Supreme Court. *See Gregg v. Georgia*, 428 U.S. 153, 168-87, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); *State v. Campbell*, 103 Wn.2d 1, 31, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *State v. Lord, supra* at 915-16.

### Pierce County Notice Procedures and Due Process

Benn argues the procedures of the Pierce County Prosecutor regarding notice under RCW 10.95.040(1) violate due process.

This contention, addressed specifically at Pierce County's death penalty notice procedures, was rejected by this court in *In re Harris*, 111 Wn.2d 691, 692-95, 763 P.2d 823 (1988).

### Signing of the Notice To Seek Special Sentencing

Benn argues the notice to seek a special sentencing proceeding as required under RCW 10.95.040(1) was in his case improperly signed by a deputy of the elected prosecuting attorney and filed by a designee.

Under RCW 36.27.040:

> The prosecuting attorney may appoint one or more deputies who shall have the same power in all respects as their principal.

Delegations of the prosecutor's authority do not vitiate what is an agency relationship between the prosecutor and his or her deputies or designees.[10]

### CONCLUSION

We find no reversible error committed in either the guilt or sentencing phase of Benn's case. Evidentiary rulings were within the discretion of the trial court. The jury instructions were in accordance with the rulings of this court, and those refused were either unsupported by the evidence, contrary to law, or cumulative. The trial court's refusal to continue the penalty phase was within the judge's sound discretion and was based upon evidence the judge properly accepted as credible. In the sentencing phase, the prosecution offered no rebuttal of mitigation witnesses and the trial court permitted all mitigation evidence Benn chose to offer. Also, even though certain portions of Benn's allocution were testimony, the judge nevertheless permitted Benn to make as complete a statement as he chose.

---

[10]The record reflects that John Ladenburg, the Pierce County prosecuting attorney, participated in deliberations and made the final decision to file the special sentencing notice in Benn's case.

The jury was convinced by sufficient evidence beyond a reasonable doubt that mitigation evidence was outweighed by the aggravating circumstances of Benn's crime of multiple murders, and we will not overturn this finding. Neither passion nor prejudice influenced the jury's determination that death is the appropriate penalty for a crime in which both the defendant and his victims had apparently shared in prior criminal conduct which led to disagreement and then murder.

The determination of whether the sentence of death imposed upon Benn was excessive or disproportionate involved the evaluation of many other cases, some in which the death penalty was imposed and some in which it was not. The record in Benn's case and our proportionality evaluation of that record lead us to a conclusion that the penalty of death imposed on Benn was not arbitrary nor imposed in a wanton or freakish manner.

We affirm Gary Benn's conviction and death sentence for the aggravated murders of Jack Dethlefsen and Mike Nelson.

DORE, C.J., concurs.

DURHAM, J. (concurring) — I agree with the majority opinion in substance. However, the methodology it employs in the proportionality section is both unnecessary and contrary to existing law. In effect, the majority adopts the precise analysis that was rejected in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992). The result is exactly that which we have sought to avoid — endless pages of comparisons to particular cases. Especially troubling is the fact that the majority compares *all* cases in a given category (multiple murders). Since this is the most common type of homicide to warrant the death penalty, that means that in every future case of multiple murder, every other case will have to be similarly compared.

This is not a hairsplitting issue — it goes to the very heart of proportionality. The purpose of proportionality review is to

avoid the systemic problems of random arbitrariness and the imposition of the death sentence based on race. *Lord*, at 909. In order to alleviate these problems, we search for "family resemblances", not individual matches. *Lord*, at 910-11. Proportionality review serves to "assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not 'wantonly and freakishly imposed' ". *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) (quoting *Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829 (1975)), *cert. denied*, 480 U.S. 940 (1987). We specifically search only for such broad tendencies because "[o]ur review is not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances." *Lord*, at 910.

While the majority pays lip service to this concept, in practice, it analyzes 30 different cases, 4 of which were acknowledged by both sides to be dissimilar, in a fruitless and misleading attempt to consider all possible matches. All that is necessary in proportionality review is that we look for a trend, not individual case matches. To do otherwise means that the failure of a *single* match would indicate disproportionality and invalidate the sentence. As we concluded in *Lord*, requiring such precise uniformity "would effectively eliminate the death penalty." *Lord*, at 910. In the majority opinion, there are 22 pages devoted to this project. What will be required 10 years from now? It is not enough to say we are following *Lord* and *Harris*, and then do the opposite. The current opinion is precisely the case-by-case comparison that was specifically rejected in *Lord*.

BRACHTENBACH, DOLLIVER, and ANDERSEN, JJ., concur with DURHAM, J.

UTTER, J. (dissenting) — I would reverse Gary Michael Benn's death sentence because it is disproportionate. I also

disagree with several other portions of the majority opinion which, though they do not change the outcome of this case, may unjustly cause others to receive the death penalty.

## I
### PROPORTIONALITY

The majority neither follows our statutory mandate nor adheres to the purposes underlying proportionality review. It deviates from the governing statute by failing to develop a pool containing all cases similar to Benn's. Finally, it ignores our previous case law. A proportionality review of Benn's sentence which is more consistent with our statutory mandate requires a finding that Benn's sentence is disproportionate.

A. The Purposes of Proportionality Review.

Proportionality review developed in response to the United States Supreme Court's opinion in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), which effectively invalidated states' death penalty statutes as violative of the Eighth and Fourteenth Amendments. One of the problems perceived by the Court was the random application of the death penalty. Justice Stewart noted the arbitrary way in which the death penalty was imposed: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." 408 U.S. at 309 (Stewart, J., concurring).

Four years later, in *Gregg v. Georgia*, 428 U.S. 153, 203, 49 L. Ed. 2d 859, 96 S. Ct. 2909, 2939 (1976), the United States Supreme Court approved Georgia's revised death penalty statute, which included a provision for proportionality review by the Supreme Court of Georgia. Although the United States Supreme Court in *Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984) has held that proportionality review is unnecessary for a constitutionally valid death penalty, our statutorily mandated duty to perform proportionality review under RCW 10.95.130(2) has in no way been diminished.

Our death penalty statute requires this court to engage in proportionality review by determining:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120 . . ..

RCW 10.95.130(2). The first sentence is identical to the Georgia statute approved by the United States Supreme Court. *See* Ga. Code Ann. § 17-10-35(c)(3) (1990). Therefore, in *State v. Harris*, 106 Wn.2d 784, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987), we adopted Georgia's test for proportionality review. The Georgia Supreme Court will not affirm a death sentence "unless in similar cases throughout the state the death penalty has been imposed *generally* and not 'wantonly and freakishly imposed,'. . .". (Italics mine.) *Moore v. State*, 233 Ga. 861, 863-64, 213 S.E.2d 829, 832 (1975), *quoted in Harris*, 106 Wn.2d at 798.

Without such review, the death penalty, like lightning, will strike some, but not others, in a way that defies rational explanation. The severity of the death penalty, its irrevocability, and our statutory mandate require us to assess carefully whether the death penalty has been imposed arbitrarily. We cannot, under the statute, simply defer to a jury's sentencing determination.

Failure to adhere to our statutorily mandated duty to conduct proportionality review would also violate due process. Where defendants have been denied their liberty interests established by state law, the United States Supreme Court has found a denial of due process. *See, e.g., Board of Pardons v. Allen*, 482 U.S. 369, 96 L. Ed. 2d 303, 107 S. Ct. 2415 (1987) (finding that Montana parole-release statute created a liberty interest entitled to protection under the due process clause); *Hicks v. Oklahoma*, 447 U.S. 343, 65 L. Ed. 2d 175, 100 S. Ct. 2227 (1980) (holding that defendant

was denied due process where he did not receive the jury sentence to which he was entitled under state law).

B. Salient Factors of Benn's Case.

The majority in this case follows *State v. Lord*, 117 Wn.2d 829, 910-11, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992), by stating that our search for similar cases should focus on discerning "family resemblances" among cases. Although imaginative, this is simply a metaphor, not a sound method. The majority in this case correctly refers to the family resemblance approach as impressionistic. Majority, at 680. A better approach would be for us to focus initially on a few salient factors in this case in developing a pool of similar cases. *See State v. Jeffries*, 105 Wn.2d 398, 436, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986).

Multiple victims, which was the sole aggravating factor found by the jury, is probably one of the most important characteristics of this case. Also significant is the fact that the victims were adults, and there was no torture and the victims probably did not experience substantial conscious suffering prior to death. Benn's prior criminal record consists only of a few property crimes, such as theft and larceny. In mitigation, there was Benn's previous good character, the love of his family, and the loss they would experience if Benn were sentenced to death. I will also follow the majority's approach by largely excluding those cases where a defendant had a mental defect or disturbance, or was youthful. Majority, at 691. In addition, I will exclude cases where defendants pleaded guilty, even though the majority cites no authority in the statute or case law for excluding them. Even excluding all of those cases, it is readily apparent that Benn's sentence is disproportionate.

C. Creating a Pool of Similar Cases.

Although the majority lists many multiple murder cases reported to this court since 1981, it fails to create a pool of all similar cases. First, the pool it does assemble contains cases which should not have been included. Second, without explanation, it fails to include many post-1981 cases that are similar to Benn's. Finally, it fails to consider cases reported

in Washington Reports or Washington Appellate Reports since January 1, 1965, as required by statute.

First, the majority inappropriately includes several cases in its pool of seven similar cases. For example, Clark Hazen (No. 39)[11] should not have been included in the majority's pool. Majority, at 692. Hazen committed suicide in prison before we could review his conviction or sentence. Therefore, there are serious questions about the reliability of Hazen's death sentence. In addition, Hazen's murders were much more brutal, and there were more aggravating circumstances found — multiple victims, concealment, rape, and robbery. Finally, including Hazen, who was only 18 at the time of his murders, in the pool of similar cases creates a glaring inconsistency. The majority refuses to include cases like that of Herbert Rice (No. 70) and Sean Stevenson (No. 50) because of their youth. It only includes Hazen's case, where the death penalty was imposed. Therefore, Hazen's case should not be included in the pool of similar cases.

Including Jeffries (No. 15) and Rupe (No. 7, No. 31) is also questionable, in light of my criticisms about the way proportionality review was conducted in those cases. *See In re Jeffries*, 114 Wn.2d 485, 505-06, 789 P.2d 731 (1990) (Utter, J., concurring in part, dissenting in part). To validate a death penalty in this case because it was imposed in those cases would simply perpetuate this court's earlier errors. Although I believe Jeffries and Rupe should be excluded for these reasons, I will include these two cases in my pool of similar cases.

I believe the majority correctly includes the other four cases, McKinley (No. 105), Runion (No. 99), Strandy (No. 37), and Thompson (No. 53), in its pool of similar cases. In all four of those cases, the defendants received sentences of life without parole.

However, the majority fails to include 15 other cases that have arisen since 1981 that are similar to Benn's. The fol-

---

[11]The numbers referenced here are the sequential numbers assigned to the reports of the trial judges as they are received by the Clerk of the Supreme Court.

lowing 15 cases match many of the salient features of Benn's case. In all 15 the defendants received life without parole as a sentence. Several of the murders were much more brutal, involving substantial conscious suffering before death, making the defendants more deserving than Benn of the death penalty. *See State v. Rupe*, 108 Wn.2d 734, 787, 743 P.2d 210 (1987) (Pearson, C.J., dissenting) (noting that almost all cases where defendants were sentenced to death involved substantial conscious suffering prior to death), *cert. denied*, 486 U.S. 1061 (1988).

Stephen Carey (No. 10) murdered his estranged wife and 18-month-old child by lighting their trailer on fire. *See State v. Carey*, 42 Wn. App. 840, 714 P.2d 708, *review denied*, 109 Wn.2d 1003 (1986). The jury found arson as an aggravating factor. His wife suffered third degree burns over 100 percent of her body and lived for approximately 18 hours after the fire. Carey had no prior record. The State did not seek the death penalty.

Pompeyo Guloy (No. 5) was a codefendant of Jimmy Ramil (No. 4), Constantine Baruso (No. 112), and Fortunato Dictado (No. 22). The State did not seek the death penalty in the cases of any of these defendants. Their victims were rival union officials. The only aggravating circumstance was multiple victims in a single event. The death penalty was not sought, thus no mitigating factors are listed in the report. There were no aspects of torture or hostage taking. Both victims were adult males, age 29, one died instantly and one was shot three or four times and lived for about 12 hours. Guloy had no known prior record. Ramil and Dictado had prior criminal records; Baruso had prior federal felonies. These defendants received life without parole.

David Simmons (No. 107), age 42, and Henry Dailey, Jr. (No. 108), age 22, murdered a couple. Gary Crabtree was shot in the head. His wife, Laurie Crabtree, was strangled with her husband's belt. The jury found three aggravating factors in each of these cases: multiple victims as part of a common scheme or plan, murders committed in furtherance of robbery, and committed to conceal the identity of the

person committing the crime. Simmons had an extensive criminal record, including convictions for first degree robbery and theft. Dailey had convictions for first degree robbery and second degree burglary. The State did not seek the death penalty. Both defendants received life without parole.

William Kincaid (No. 16) murdered his wife and sister-in-law with a shotgun after a marital breakup. The only aggravating circumstance was multiple murders. No prior criminal record is listed in the report. The State did not seek the death penalty, and Kincaid received a sentence of life without parole.

Minviluz Macas (No. 101) set fire to her house, killing her 85-year-old husband and two of their children, ages 9 and 11. The jury found multiple murders and arson as aggravating factors. She had no prior record. The State did not seek the death penalty, and she received life without parole.

Frederick Peerson (No. 86) murdered two persons who had sold marijuana to him. He held one victim hostage. Peerson tied the victim to a chair with electrical cords and a leather belt, poked sharp objects into his ears, and struck him on the head with a large crescent wrench. The jury found two aggravating circumstances, multiple victims and robbery. Mitigation evidence was offered that Peerson suffered brain damage as a result of a car accident. The report also indicates Peerson suffered from posttraumatic depression and an antisocial personality. His record included a second degree burglary conviction, and attempted murder. The State sought the death penalty, but Peerson received a sentence of life without parole.

Kenneth Peterson (No. 42) murdered a husband, age 30, and wife, age 24. After murdering the husband, Peterson forced the wife to drive to a graveyard, where he shot her twice. Multiple victims was the only aggravating circumstance. In mitigation, Peterson's diminished mental capacity and his artistic skill were offered. Peterson had no prior criminal record. The State sought the death penalty, but the jury was unable to agree. He received life without parole.

George Russell (No. 120) was 33 years old when he was convicted of two counts of aggravated first degree murder and one count of first degree murder. Burglary was the aggravating circumstance. The defendant was convicted for three serial murders of young women. Russell, like Benn, had previous convictions for property crimes. The State did not seek the death penalty, and Russell received life without parole.

At age 25, Lawrence Sullens (No. 69) murdered a couple in their home. He also beat and shot their 11-year-old daughter. She survived, even though he left her in the house and lit it on fire. The jury convicted Sullens of two counts of aggravated first degree murder, one count of attempted first degree murder, and one count of first degree arson. It found concealment and multiple victims as aggravating circumstances. The report indicates Sullens had no prior criminal record. The State did not seek the death penalty. Sullens received life without parole.

Thomas Baja (No. 59),[12] at the age of 43, shot his ex-wife and her male companion in the head after entering her home. The jury found one aggravating factor — multiple victims. The report lists no prior criminal record. The only mitigating evidence listed was that the defendant suffered from posttraumatic stress disorder. Baja received life without parole.

---

[12]Although the majority does not expressly indicate why Baja and Pawlyk are not part of its pool of similar cases, it suggests that the difference between these cases and Benn's is that these were "crimes of passion". Majority, at 681, 686. This is not an adequate basis for distinguishing these cases.

To characterize these defendants' crimes as ones of passion contradicts, at least in part, their convictions for aggravated first degree murder. In order to be convicted of aggravated first degree murder, RCW 10.95.020 requires that an individual commit first degree murder as defined by RCW 9A.32.030(1)(a). Under RCW 9A.32.030(1)(a) one is guilty of first degree murder if one acts "[w]ith a premeditated intent to cause the death of another person". RCW 9A.32-.030(1)(a). Even though strong emotions may have motivated the defendants in these cases, the jury still found that they both had developed a conscious plan to take another's life. I reject the notion that domestic violence that culminates in aggravated first degree murder is somehow less serious.

William Pawlyk (No. 116) murdered his ex-girlfriend and her new boyfriend. The aggravating circumstance was multiple victims. Both victims were stabbed in excess of 100 times. Pawlyk had no prior record. The State did not seek the death penalty. Pawlyk pleaded insanity, which the jury rejected. He received a sentence of life without parole.

Adding these 15 cases to the 6 cases from the majority's pool makes a total of 21 similar cases since 1981. Only 2 out of 21 of the defendants in those cases received the death penalty. This is a frequency of less than 10 percent.

But even this pool of 21 similar cases does not represent the totality of cases we must consider for purposes of proportionality review. Yet another flaw in the majority's development of a pool of similar cases is its failure to mention any of the cases decided between 1965 and 1981. Our statute mandating proportionality review requires us to consider not only post-1981 cases where reports have been filed with us, but also those "cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed". RCW 10.95.130(2)(b).

Six cases involving the murders of more than one person between 1965 and 1981 where the judge or jury considered imposition of the death penalty are similar enough to Benn's that we must use them for purposes of proportionality review.

In one of those six cases, the defendant was sentenced to death. *State v. Quinlivan*, 81 Wn.2d 124, 499 P.2d 1268, 72 A.L.R.3d 835 (1972) (defendant convicted of one count of first degree murder and one count of second degree murder and sentenced to death).[13] In the other five cases, the jury

---

[13]There are a few murder cases where defendants were sentenced to death that I do not include in the pool of similar cases because they are distinguishable. *State v. Canaday*, 79 Wn.2d 647, 488 P.2d 1064 (1971) (defendant convicted of two counts of first degree murder for tying up two women, raping them, and then strangling them), *vacated in part*, 408 U.S. 940 (1972); *State v. Smith*, 74 Wn.2d 744, 446 P.2d 571 (two brutal murders in the course of several robberies), *vacated in part*, 408 U.S. 934 (1972); *State v. Hawkins*, 70 Wn.2d 697, 425 P.2d 390 (1967)

did not sentence the defendants to death. *State v. Grisby*, 97 Wn.2d 493, 647 P.2d 6 (1982) (death penalty sought, but not imposed, on two defendants convicted of five counts of aggravated murder), *cert. denied sub nom. Frazier v. Washington*, 459 U.S. 1211 (1983); *State v. Carothers*, 9 Wn. App. 691, 514 P.2d 170 (1973) (defendant robbed and killed elderly couple), *aff'd*, 84 Wn.2d 256, 525 P.2d 731 (1974); *State v. Haga*, 81 Wn.2d 704, 504 P.2d 787 (1972) (defendant convicted of two counts of first degree murder for slaying of wife and 7-month-old daughter); *State v. Baker*, 78 Wn.2d 327, 474 P.2d 254 (1970) (defendant shot estranged wife and mother-in-law).

Admittedly, the cases between 1965 and 1981 are less useful in many respects for conducting proportionality review. In making comparisons, we do not have the benefit of the more detailed information contained in the questionnaires trial courts have completed since 1981 as required by RCW 10.95.120. In addition, defendants in those cases were sentenced under earlier versions of Washington's death penalty statute which have subsequently been declared unconstitutional. None of those sentenced to death during that period has been executed. Nonetheless, it is striking that even under these earlier versions of our death penalty statute, defendants in cases similar to Benn's were sentenced to death in only one of six similar cases, or about 17 percent.

The following chart summarizes the results in cases similar to Benn's:

| | Similar Cases | Death Penalty Imposed | Death Penalty Percentages |
|---|---|---|---|
| 1981-present | 21 | 2 | Less than 10 percent |
| 1965-1981 | 6 | 1 | About 17 percent |
| Total | 27 | 3 | About 11 percent |

(defendant convicted of murdering two children), *cert. denied*, 390 U.S. 912 (1968). In addition, two codefendants were convicted of three murders during robberies and sentenced to death, but irregularities in jury selection resulted in reversal of their sentences. *State v. Aiken*, 75 Wn.2d 421, 452 P.2d 232 (1969), *rev'd*, 403 U.S. 946 (1971).

Therefore, in cases similar to Benn's, the death penalty was imposed in only 3 out of 27 cases, or about 11 percent of the time.

D. Determining Whether the Death Penalty Is Proportionate.

After developing a pool of similar cases, the majority also fails to apply the correct test for determining whether Benn's sentence is proportionate. RCW 10.95.130(2)(b) requires us to determine whether the death penalty is "excessive or disproportionate to the penalty imposed in similar cases". In the past, we have followed Georgia's test for proportionality, which is whether the death penalty has "been imposed 'generally' in similar cases." *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) (citing *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829 (1975)), *cert. denied*, 480 U.S. 940 (1987). The word "generally" means significantly more than 50 percent. *State v. Jeffries*, 105 Wn.2d 398, 437, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986). Here, the death penalty has only been imposed in 3 out of 27 cases, or about 11 percent of the time, so it has not been generally imposed.

The majority fails to address the issue of whether the death penalty has been generally applied in similar cases. It simply inquires whether there is an "arbitrary frequency of life without parole sentences over death sentences" among cases similar to Benn's. Majority, at 692. It cites no authority for this approach, and gives no reasons for departing from the standards we and other states with similar statutes have adopted.

The majority's version of proportionality review is inconsistent with that employed in several states, such as North Carolina, Pennsylvania, and Georgia, which have statutes mandating proportionality review virtually identical to Washington's. In these other states, the death penalty is deemed proportionate if it is applied in the vast majority of similar cases.

For example, North Carolina's statute mandating proportionality review of death penalty cases contains the same language as our statute, namely whether "the sentence of death is excessive or disproportionate to the penalty imposed

in similar cases, considering both the crime and the defendant." N.C. Gen. Stat. § 15A-2000(d)(2). A review of North Carolina's death penalty cases reveals that the death penalty is deemed disproportionate where it has been applied less than half the time in similar cases. *See, e.g., State v. Cummings*, 323 N.C. 181, 198, 372 S.E.2d 541, 552 (1988) (finding death penalty proportionate where death penalty imposed in four of five other cases in which a defendant had been convicted of a prior violent felony resulting in the victim's death), *cert. granted and judgment vacated on other grounds*, 494 U.S. 1021 (1990); *State v. Benson*, 323 N.C. 318, 328-29, 372 S.E.2d 517, 523 (1988) (finding death penalty disproportionate where death penalty imposed in only 4 out of 51 robbery-murder cases); *State v. Stokes*, 319 N.C. 1, 22, 352 S.E.2d 653, 665 n.14 (1987) (finding death penalty disproportionate, because codefendant given life sentence, and because North Carolina juries have recommended life imprisonment in especially heinous cases in 20 cases involving 24 defendants, while recommending the death penalty in 16 cases involving 17 defendants); *State v. Rogers*, 316 N.C. 203, 235, 341 S.E.2d 713, 732 (1986) (finding death penalty disproportionate for defendant found guilty of shooting one individual and attempting to shoot another, where in the pool of similar cases death was the penalty in 23 cases and life sentences in 76 cases), *overruled on other grounds in State v. Vandiver*, 321 N.C. 750, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985) (finding the death penalty disproportionate where death penalty imposed in 5 out of 28 robbery-murder cases in the pool of similar cases); *State v. Bondurant*, 309 N.C. 674, 693, 309 S.E.2d 170, 182 (1983) (finding death penalty disproportionate where applied only in 13 out of 78 similar cases).[14]

North Carolina's experience with proportionality review also belies the majority's claim that a more exacting form of

___

[14]The North Carolina Supreme Court has stated that numerical disparity is not always dispositive of a case where some additional heinous fact is involved. *See, e.g., State v. Greene*, 324 N.C. 1, 23, 376 S.E.2d 430, 445 (1989) (finding death penalty proportionate where defendant committed brutal patricide), *vacated on other grounds*, 494 U.S. 1022 (1990).

proportionality review would, in effect, substitute this court's judgment for that of the jury. North Carolina has not overturned an inordinate number of death sentences through proportionality review. In a recent case, the court stated that it had affirmed the guilt and sentencing phases in 38 capital cases. It had vacated the death sentence as disproportionate in 6 cases. *Cummings*, at 198. This is less than one in seven, or about 14 percent. Presumably, if we adopted a similar methodology, we would not frequently substitute our judgment for that of the jury, provided of course that statewide patterns of action are taken into account before the death penalty is sought.

Pennsylvania also has a statute mandating proportionality review which is virtually identical to Washington's. 42 Pa. Cons. Stat. Ann. § 9711(h)(3)(iii) (Purdon Supp. 1992). The Pennsylvania Supreme Court looks closely at the relative frequency of death sentences in the pool of similar cases it develops, approving death sentences as proportionate where the vast majority of defendants in similar cases also received the death penalty. *See, e.g., Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371 (1986) (finding death penalty proportionate where it was imposed in eight out of nine similar cases), *cert. denied*, 480 U.S. 951 (1987); *Commonwealth v. Whitney*, 511 Pa. 232, 249-50, 512 A.2d 1152, 1161-62 (1986) (finding death penalty proportionate where it was imposed in the "overwhelming majority" of similar cases); *Commonwealth v. Pirela*, 510 Pa. 43, 507 A.2d 23 (1986) (finding death penalty proportionate where it was imposed in six out of eight similar cases); *Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367 (1985) (finding death penalty proportionate where sentence imposed in seven out of seven similar cases).

Finally, we should follow the example set by the Georgia Supreme Court, which in the past has provided us with guidance in conducting proportionality review. *Harris*, 106 Wn.2d at 798. In D. Baldus, G. Woodworth, & C. Pulaski, *Equal Justice and the Death Penalty: A Legal and Empirical Analysis* 198-228 (1990), the authors describe a study of 68 of the 69 death penalty cases the Georgia Supreme Court

reviewed pursuant to its post-*Furman* proportionality legislation. The study indicates that when the Georgia Supreme Court finds a sentence proportionate, the sentences in most, if not all, of the similar cases, were death sentences. The authors note that

> in almost 90 percent of the sixty-eight cases that we analyzed, every case identified in the court's appendix as similar to the death case under review resulted in a death sentence. For only five of the sixty-eight cases was the death-sentencing rate among the appendix cases less than .75, and for only one case was it less than .50.

(Footnote omitted.) *Equal Justice*, at 203. Therefore, once the Georgia Supreme Court creates a pool of similar cases, it does not simply rely on one or two isolated precedents to justify its conclusion that the death penalty is proportionate. Instead, it finds the death penalty proportionate when the punishment in the vast majority of cases in the proportionality pools was death. In other words, it finds the death penalty proportionate only where it has *generally* been imposed.

I cannot, following our statutory mandate, ease the requirements of comparative proportionality review to the point where it becomes an empty ritual. To fail to perform our statutorily mandated review also raises serious due process problems. Here the death penalty has only been imposed 3 times in 27 similar cases. It has not generally been imposed. Therefore, I would vacate Benn's sentence because it is disproportionate.

## II
### OTHER ERRORS

The majority also makes several legal errors which could have major significance for future capital cases. Although these other matters do not affect the outcome of this case, I write separately in the hope that the court will rectify these errors in the future.

A. Standard of Review.

The United States Supreme Court has repeatedly emphasized that the death penalty is fundamentally different from all other punishments because of its severity and finality. *Murray v. Giarratano*, 492 U.S. 1, 9, 106 L. Ed. 2d 1, 109 S.

Ct. 2765 (1989); *Beck v. Alabama*, 447 U.S. 625, 637, 65 L. Ed. 2d 392, 100 S. Ct. 2382, 2389-90 (1980). The finality of the death penalty requires "a greater degree of reliability when [it is] imposed." *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

In setting forth the standard of review in capital cases, the majority magnifies errors committed by the majority in *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992). See majority, at 648. First, it states that assignments of error in the guilt phase of a capital case are reviewed in the same manner as in noncapital cases. As I noted in my dissent in *State v. Lord, supra* at 925 n.39, the United States Supreme Court has employed heightened scrutiny to the guilt phase of a capital case. *See Beck v. Alabama*, 447 U.S. at 638. The reason for heightened scrutiny is that irregularities during the guilt phase can unfairly expose defendants to the ultimate punishment, the death penalty. Therefore, there is a corresponding need for reliability during the guilt phase of a capital case.

In addition, the majority undermines the heightened scrutiny of the sentencing phase of a capital case. It says that "while heightened scrutiny means a closer, more careful review of the record, it does not entail a raised standard of review." Majority, at 648 (citing *Lord*, 117 Wn.2d at 888). I cannot understand this argument. As an appellate court, it is our duty to review thoroughly the record in all cases that come before us, regardless of whether they are capital or noncapital. Significantly, the United States Supreme Court has never indicated that heightened scrutiny simply means delving deeper into the details of the record.

Heightened scrutiny means something more. The federal constitution requires that we also determine that the procedures used meet the standard of increased reliability in capital cases. The United States Supreme Court has routinely treated capital defendants differently from noncapital defendants in its attempt to insure reliability of sentencing

determinations. *See, e.g., Beck v. Alabama, supra* at 637-38 (holding that constitution required that jury be able to consider lesser included offenses in capital case, but indicating this requirement need not be extended to noncapital cases); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (holding that capital defendants must be allowed to present all mitigating evidence, while acknowledging legislation may limit evidence in a noncapital case). As Justice Harlan wrote:

> So far as capital cases are concerned, I think they stand on quite a different footing than other offenses. In such cases the law is especially sensitive to demands for that procedural fairness . . . I do not concede that whatever process is "due" an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case. The distinction is by no means novel, . . . nor is it negligible, being literally that between life and death.

*Reid v. Covert*, 354 U.S. 1, 77, 1 L. Ed. 2d 1148, 77 S. Ct. 1222 (1957). In effect, the Court employs a higher standard of review to insure the reliability of a death penalty determination. We must follow the United States Supreme Court by applying a higher standard of review to the guilt and penalty phases of a capital case.

B. Failure To Object at Trial.

The majority suggests that a capital defendant may be precluded from raising an issue for the first time on appeal. Majority, at 673-74. It cites noncapital cases for the proposition that claims of instructional error that are not constitutional may not be raised for the first time on appeal. *See State v. Fowler*, 114 Wn.2d 59, 785 P.2d 808 (1990); *State v. Scott*, 110 Wn.2d 682, 689, 757 P.2d 492 (1988). The majority fails to discuss that we allow capital defendants to challenge jury instructions on appeal even when they made no objection to the instructions at trial because of the severity of a death sentence. *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986).

The failure of the majority to follow federal constitutional principles in this and other cases may require reversal. It

also is likely to prolong the length and add to the expense of capital cases.

SMITH and JOHNSON, JJ., concur with UTTER, J.

Reconsideration denied March 19, 1993.